UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF BRISTOL PENSION FUND, On Behalf of Itself and All Others Similarly Situated, )<br>)<br>)<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>VERTEX PHARMACEUTICALS INC., )<br>JOSHUA BOGER, Ph.D., JEFFREY LEIDEN, )<br>M.D., Ph.D., PETER MUELLER, Ph.D., )<br>PAUL SILVA, ELAINE ULLIAN, AND )<br>NANCY J. WYSENSKI, )<br>)<br>Defendants. )<br>) | No. <br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><br>DEMAND FOR JURY TRIAL |

1.     Plaintiff City of Bristol Pension Fund ("City of Bristol") alleges the following based upon the investigation of Plaintiff's counsel, which included, among other things, a review of the Defendants' public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Vertex Pharmaceuticals, Inc. ("Vertex" or the "Company"), securities analysts' reports about the Company, and information readily available on the Internet.  Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

2.     This is a securities fraud class action on behalf of all persons or entities that purchased or otherwise acquired the common stock of Vertex between May 7, 2012 and June 28, 2012 (the "Class Period").  The action is brought against Vertex, Director Joshua Boger ("Boger") (also the Company's founder), Chief Executive Officer Jeff Leiden ("Leiden"), Executive Vice President Peter Mueller ("Mueller"), Senior Vice President and Corporate Controller, Paul Silva ("Silva"), Director Elaine Ullian ("Ullian"), and Executive Vice President and Chief Commercial Officer, Nancy Wysenski ("Wysenski") (collectively "Defendants") for violations of the federal securities laws for making false and misleading public statements concerning Vertex's products VX-809 and Kalydeco during the Class Period.[1]

3.     Vertex is a biotechnology company founded by Boger in 1989 and headquarted in Cambridge, Massachusetts.  Its stated mission is to cure patients with previously incurable diseases.  To do so, it researches and develops medications primarily focused on viral infections,

---

[1]     Defendants Boger, Leiden, Mueller, Silva, Ullian, and Wysenski are collectively referred to herein as the "Individual Defendants."

autoimmune disorders, inflammatory diseases, and cancer.  In 1998, it began working on drugs to combat Cystic Fibrosis ("CF"), the deadly genetic disease.

4.      Vertex received Food and Drug Administration ("FDA") approval for its medication "Kalydeco" in early 2012.  Kalydeco is targeted at treating the causes, rather than merely the symptoms of CF.  As Kalydeco by itself only treats persons with a rare form of the disease, Vertex began a series of phased testing of the medication in combination with another of its experimental drugs, VX-809.  Soon after receiving approval and before conclusion of any definitive testing, however, Defendants capitalized on the potentially revolutionary nature of its medication for their own gain.

5.      At the start of the Class Period on May 7, 2012, Vertex announced "interim data" from its Phase 2 study of VX-809 and Kalydeco that, according to the Company, resulted in 46% of its treatment group experiencing "an absolute improvement" in lung function of five percentage points or more and 30% experiencing the same absolute improvement of ten percentage points or more.  This caused a significant (close to *50%*) increase in the Company's stock price.  In fact, the Company's stock price soared upward between closing on May 4, 2012 and May 25, 2012, buoyed by Defendants' misleading statements, dramatically rising from its closing price of $37.41 per share on May 4, 2012 to a closing price of $64.85 per share in heavy trading on May 25, 2012.  Meanwhile, unbeknownst to investors, the individual Defendants began cashing in.  In fact, knowing the market would respond positively to the announcement of the purportedly successful clinical trials, those individual Defendants proceeded to make a series of sales of Company stock in a relatively short period of time -- capitalizing on the fabricated rise in stock price to the tune of almost *$30 million in insider trading.*  These sales were labeled

by one United States Senate member as "a potentially troubling issue for investors in the pharmaceutical industry and for the federal government."

6.      Indeed, while Defendants touted the exceptional results of the phased study of the two medications in addressing the cause of CF, those results were grossly overstated.

7.      While the individual Defendants profited off of the false information related to the phased trials, public investors, including Plaintiff, did not fare so well.  A few weeks after May 7, 2012, the Company announced that the positive results were, in fact, overstated.  Then, one month later, the Company again revised the testing results downward.  On this news, the Company's stock price plummeted from its previous close of $61.11 on June 27, 2012, to a close at $51.18 per share on June 28, 2012.  The Class Period stock price inflation was due to Company specific misstatements as the S&P 500 Index was relatively flat on a comparative basis during this same period.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under §§10(b), 20(a) and 20A of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b), 78t(a) and 78t-1, and Rule 10b-5, 17 C.F.R. §240.10b-5.  Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.

9.      Venue is proper in this district pursuant to §27 of the 1934 Act.  Acts and transactions giving rise to the violations of law complained of occurred in this district.

## THE PARTIES

10.      Plaintiff City of Bristol purchased Vertex common stock during the Class Period as described in the attached certification and was damaged thereby.

11.      Defendant Vertex is a biotechnology company headquartered at 130 Waverly Street, Cambridge, Massachusetts.  Vertex researches, develops, and commercializes medicine

for viral diseases, inflammation, autoimmune diseases, cancer, pain, and CF.  During the Class

Period, Vertex had approximately 211 million shares of common stock outstanding, which shares

traded in an efficient market on the NASDAQ National Market System.

12.     Defendant Joshua Boger, Ph.D. founded Vertex in 1989 and served as its Chief

Executive Officer from 1992 until May 2009, as well as Chairman of the Board from 1997 until

2006.  During the Class Period, Boger served as a Director of the Company and sold roughly

$700,000 in Company stock.  Upon information and belief, Boger resides in Massachusetts.

13.     Defendant Jeffrey Leiden, M.D., Ph.D., became a member of the Vertex board of

directors in 2009 and its President and Chief Executive Officer ("CEO") in December 2011.  He

is the former President and Chief Operating Officer of Abbott Laboratories.  Upon information

and belief, Leiden resides in Massachusetts and Florida.

14.     Defendant Peter Mueller, Ph.D., has been the Chief Scientific Officer and

Executive Vice President of Global Research & Development at Vertex since July 2003 and May

2009, respectively.  During the Class Period, Mueller sold over $4.4 million of Company stock.

Upon information and belief, Mueller resides in Massachusetts.

15.     Defendant Paul Silva joined Vertex in 2007 as a Senior Director and then became

Vice President and Corporate Controller in 2008, a position he held until April 2011.  During the

Class Period, Silva sold almost $3.5 million in Company stock.  Upon information and belief,

Silva resides in Massachusetts.

16.     Defendant Elaine Ullian has served as a director of Vertex since 1997 and is the

Company's co-lead independent director.  During the Class period, Ullian sold over $1.2 million

in shares.  Upon information and belief, Ullian resides in Massachusetts.

17.     Defendant Nancy J. Wysenski served as the Chief Commercial Officer and Executive Vice President of Vertex from December 2009 to June 2012.  During the Class Period, Wysenski sold **almost $22 million in stock.**  Upon information and belief, Wysenski resides in Massachusetts.

18.     Defendants Boger, Leiden, Mueller, Silva, Ullian, and Wysenski ran Vertex as "hands-on" managers dealing with important issues at the Company, including new product development, the marketing of Vertex products, and monitoring the performance and sales of Vertex's products.

## BACKGROUND

19.     Vertex is the 23rd largest biotechnology company in the world by revenue.  It researches, develops, and commercializes medicine for viral diseases, inflammation, autoimmune diseases, cancer, pain and CF.  The company engages in discovering, developing, manufacturing, and commercializing small molecule drugs for the treatment of serious diseases worldwide.  Its products include prescription medicines used for the treatment of patients with hepatitis C, HIV, and influenza, among other afflictions.  The products are marketed worldwide with networks in the United Kingdom, Japan, and Belgium.  Many of its revenues are derived from royalties and net sales from collaborative agreements with other companies, including GlaxoSmithKline, Johnson & Johnson, and Merck.  Founded in 1989 by Defendant Boger, Vertex is headquartered in Cambridge, Massachusetts.

20.     In early 2012, Vertex shares dropped in value on signs that competitors were gaining ground in the field of medications for hepatitis C.  Around the same time, in January 2012, Vertex gained approval for the drug Kalydeco.  Kalydeco is intended to be the first drug to treat the causes of CF rather than just the symptoms.  Kalydeco alone, however, was approved

only for patients with a specific genetic mutation—a group that accounts for approximately 4% of those with CF.  However, Vertex began exploring the combination of Kalydeco with other medications or therapies to treat those with more common forms of CF.

21.     As background, CF is a fatal lung disease that claims about 500 lives each year, with 1,000 new cases diagnosed annually.  In the United States, approximately 30,000 individuals have CF, making it one of the most widespread fatal genetic diseases.  CF is caused by a defective gene that directs the body to produce abnormally thick and sticky mucus.  This mucus builds up in the breathing passages of the lungs and in the pancreas, resulting in life-threatening lung infections and serious digestion problems.  Breathing problems generally worsen as an individual ages, often requiring double lung transplantation.  Unfortunately, CF is a fatal disease; individuals normally die of lung complications.  The average life expectancy of someone with CF is only 37 years.  There is as of yet no cure for CF.

22.     Research has, however, greatly assisted in both the lifestyle and the prognosis for those afflicted with CF.  In 1959, the median age of survival of children with CF in the United States was six months.  Since then, great strides have not only increased the life span of CF patients, but also has developed several treatment methods that enable individuals with CF to have a fuller life less encumbered by their condition.  In 1989, the CF gene was discovered, which has enabled scientists to attempt gene therapy.  With the potential cure for CF ostensibly close, numerous clinical research trials and developmental drugs have arisen. Indeed, CF is currently estimated to be a $3 to $4 billion market that affects 70,000 persons world-wide.  As CF is such a tragic disease that is seemingly near to a cure, any potential "blockbuster" news will trigger excitement.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS
## AND SCHEME TO DEFRAUD DURING THE CLASS PERIOD

23.     At the start of the Class Period, on May 7, 2012, Vertex announced that it had achieved significant results in its clinical Phase 2 study of combining the experimental drug VX-809 and Kalydeco to treat people with CF.  Its May 7, 2012 press release is titled, "Interim Data from Phase 2 Combination Study of VX-809 and KALYDECO ™ (ivacaftor) Showed Significant Improvements in Lung Function (FEV1) in People with Cystic Fibrosis Who Have Two Copies of F508del Mutation."   That press release announced that the Company had analyzed results after "approximately half of the study patients had completed 56 days of treatment" and went on to state:

> Of those who received VX-809 and KALYDECO (250 mg, q12h), approximately *46 percent (17/37) experienced an absolute improvement* from baseline to Day 56 in lung function of 5 percentage points or more, and approximately *30 percent (11/37) experienced an absolute improvement* from baseline to Day 56 of 10 percentage points or more.  None of the patients treated with placebo (0/11) achieved a 5-percentage point or more improvement from baseline to Day 56 in lung function.  Most adverse events were mild or moderate in severity and comparable between treatment and placebo groups.

[Emphasis added.]

24.     The press release went on to quote Vertex executive Dr. Christopher Wright stating "[f]or the past 14 years, our teams have focused on learning about the underlying cause of cystic fibrosis so we can develop new medicines to help as many patients as possible.  Today we believe we're one step closer to this goal."   Meanwhile, on a conference call held that same day, Defendant Leiden told analysts that "[t]hese data did exceed our expectations…   They are leading us to accelerate 809 and Kalydeco into pivotal trials."

25.     The Company's stock price rose precipitously on this news, increasing from an closing price of $37.41 per share on May 4, 2012 to close at $58.12 per share on May 7, 2012, on volume *40 times higher than the average trading volume*.

26.     Announcement of the interim results in the VX-809 and Kalydeco study was received very favorably by the public.  Indeed, Vertex shares soared on the belief that the Company could have a multibillion-dollar franchise in the treatment of CF.  The results exceeded expectations and made it appear to the public that Vertex – whose shares were under pressure as its competitors were outperforming in the hepatitis C market – had great prospects.  That day, an ISI analyst opined that Vertex could have a *$4 billion franchise in CF – calling the data "excellent and much better than expected."*  Similarly, that same day a UBS analyst wrote that "…we see this as a blockbuster opportunity for Vertex" with potential for more than $1 billion in sales in 2016.

27.     As Defendants continued heralding the positive and "unexpected" interim Phase 2 study results, the Company's stock traded as high as $64.94 on May 25, 2012, closing at $64.85.  Taking advantage of the bloated stock price stemming from the study results announcement on May 7, 2012, Defendants Boger, Mueller, Silva, Ullian, and Wysenski collectively sold *tens of millions of dollars in stock* immediately following the announcement.  Indeed, on May 7 and 8 alone, Defendant Wysenski sold over *$10 million in shares.*  One week later, she sold another *$11.5 million in shares.*

28.     These suspiciously timed sales prompted Iowa Senator Charles Grassley to write to SEC Chairwoman Mary Shapiro, asking her to probe whether the Individual Defendants illegally profited unfairly from stock sales.  In his letter, Senator Grassley wrote "[i]t could appear that these Vertex [VRTX] executives potentially took advantage of the spike in the stock knowing the news of the clinical data being overstated would be made public eventually, which in turn would negatively affect the stock value."

29.     In fact, as discussed below, the statements in the May 7, 2012 press release were false and were later corrected publicly.  The incomplete and misleading statements Defendants made during the Class Period were false, misleading, and/or incomplete because Defendants knew, or were reckless in not knowing, that the "absolute improvement" percentiles were grossly inflated.  However, by making the false statements, Defendants were able to buoy the share price of Vertex which had just recently declined due to competition from other producers of hepatitis C medications.  Moreover, during the spike in the stock price resulting from the false and misleading statements, the Individual Defendants sold enormous amounts of stock for immense personal gains.

### THE TRUTH BEGINS TO EMERGE

30.     Beginning on May 29, 2012, the Company began to disclose that the 46% and 30% of patients experiencing absolute improvement during the Phase 2 trial of the two medications were incorrect results.

31.     On May 29, 2012, the Company issued a press release "correcting" the interim analysis of Phase 2 Combination Study of VX-809 and Kalydeco.  That press release stated that, in fact:

> The actual absolute improvements in lung function for these patients are: approximately 35 percent (13/37) experienced an absolute improvement of 5 percentage points of more and approximately 19 percent (7/37) experienced an absolute improvement of 10 percentage points or more from baseline to day 56.

32.     On a conference call that same day, the Company stated that the correction was due to a "misinterpretation" between Vertex and a third-party statistical analysis vendor over whether the data showed an absolute change in lung function or a relative one.  The Company refused to disclose the vendor.  On a conference call that day, Defendant Leiden called the news

"disappointing" but said that the final data – which would be released soon - "will trump all of this and will be able to tell you much more definitively about where we are."

33.     On this news, the stock price sank from a close of $64.85 on May 25, 2012 to a close of $57.80 on May 29, 2012, the stock's greatest decline in three years.  As reported by the AP Wire that day:

> Shares of Vertex Pharmaceuticals Inc. plunged Tuesday after the company said it made a mistake in calculating results from a clinical trial of two cystic fibrosis drugs.
>
> The Cambridge, Mass., company said the combination of its drug Kalydeco and an experimental medication called VX-809 did not work as well as it had initially reported.  The original trial results suggested that Kalydeco and VX-809 were more effective at improving lung function in patients with the common type of cystic fibrosis, which is a disease that causes sticky mucus to build up in the lungs and other organs. Kalydeco is currently approved to treat a rare form of the disease.
>
> In a conference call, Vertex said the error "was the result of a misinterpretation between Vertex and our outside statistical vendor concerning the type of responder analysis performed."
>
> Despite the error, Vertex said patients who took the regimen of Kalydeco and VX-809 experienced a significant improvement.
>
> Vertex stock jumped 55.4 percent on May 7 after the company reported the results it now says were incorrect, and the shares are up 73.4 percent since May 4.  In midday trading Tuesday the shares tumbled $9.48, or 14.6 percent, to $55.37.

34.     When Vertex announced the "final results" of its Phase 2 study of VX-809 and Kalydeco on June 28, 2012, it suddenly changed the parameters of the study and no longer reported percentiles of "absolute improvement" over a 56 day period.  Instead, the press release issued that day stated that, "[h]eterozygous patients who were treated with the combination experienced a mean absolute improvement in lung function compared to placebo from Day 28 to 56" and "[b]ased on these data, Vertex plans to conduct additional clinical studies of VX-809 and KALYDECO in heterozygous patients."   On a conference call held the same day,

Defendants told analysts that even though it did not give "exactly comparable results" (*i.e.*, absolute improvement over 56 days), the results it did present should be able to speak alone and justify more testing. However, the Company refused to give any comparable results. Understandably, the ambiguity and uncertainty around the final results caused investor skepticism.

35. A Reuters article from that same day reported:

(Reuters) - Vertex Pharmaceuticals Inc (VRTX.O) said its combination CF treatment significantly improved patient lung function in a mid-stage clinical study, but *investor skepticism about how the results were presented and over the strength of the data itself sparked a sharp selloff of company shares*.

Vertex shares closed down 16.2 percent at $51.18 on Thursday and were off as much as 21.7 percent at the depth of the selloff.

The data was the final results from a Phase II study of Vertex's CF drug Kalydeco in combination with an experimental drug, VX-809. Interim results from the trial presented last month sent the company's shares soaring as they appeared to show a surprisingly strong improvement in lung function in patients with the life-shortening disease.

Some of those gains were later lost after the company was forced to revise the data due to a statistical mistake in which it confused relative with absolute results. *The final results presented on Thursday contained ambiguities that further unsettled investors*.

"*This is now the third and most confusing disclosure about a relatively small study, and this one raises even more questions about management's transparency and credibility*," said Sanford Bernstein analyst Geoffrey Porges, who has been a strong supporter of Vertex in the past.

In particular, the company did not present exactly comparable results between the interim and final data.

"*This non apples-to-apples disclosure has created investor doubt that the data are 'real,'*" said Mark Schoenebaum, an analyst at ISI Group, in a research note.

Company executives told analysts on a conference call that even though it did not present exactly comparable results, the final results should stand alone and indicate the treatment is effective at the highest VX-809 dose of three tested. Vertex said the results warrant moving forward into late-stage clinical development, which it plans to begin in early 2013.

"At the interim analysis they encouraged everybody to focus on the difference between day zero - the start of treatment - and day 56 - the end of treatment - which is a logical approach. But in final analysis they asked everyone to focus on halfway through the study at day 28 and day 56," Porges said.

*"They (Vertex management) believed that they could move the goal posts on the disclosure, spin the story heavily in their favor and not see a reaction.  I don't think that they'll believe that after today."*

The company declined to comment on the steep drop in its share price.

Kalydeco, which in January became the first drug approved to treat the underlying cause rather than symptoms of the serious lung disease, helps about 4 percent of CF patients with a specific gene mutation.

Vertex is hoping that the drug, when combined with VX-809, will eventually be able to treat the larger CF population.

CF causes the thin layer of mucus that helps keep lungs free of germs to thicken, clogging airways and damaging the lungs.  The average life expectancy for the disease is 37 years as damage to the lungs progresses, limiting the ability to breath.

[Emphasis added.]

36.     The final results caused the stock price of the Company to plummet from a close of $61.11 on June 27, 2012 to a close of $51.18 on June 28, 2012.

## CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired Vertex common stock between May 7, 2012 and June 28, 2012 (the "Class").  Excluded from the Class are the Defendants, officers and directors of the Company as well as their families, and the families of the Defendants.   Class members are so numerous that joinder of them is impracticable.

38.     Common questions of law and fact predominate and include whether Defendants: (a) violated the 1934 Act; (b) omitted and/or misrepresented material facts; (c) knew or recklessly disregarded that their statements were false; (d) traded on inside information; and (e) artificially inflated the price of Vertex common stock and the extent of and appropriate measure of damages.

39.     Plaintiff's claims are typical of those of the Class.   Prosecution of individual actions would create a risk of inconsistent adjudications.   Plaintiff will adequately protect the interests of the Class.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

40.     At all relevant times, the market for Vertex's common stock was an efficient market for the following reasons, among others:

(a)     Vertex's stock met the requirements for listing, and was listed and actively traded on the NASDAQ National Market, a highly efficient and automated market;

(b)     According to the Company's Form 10-Q filed May 10, 2012, as of April 27, 2012, there were over 211 million shares of Vertex common stock outstanding.   During the Class Period, on average, more than 5 million shares of Vertex stock were traded on a daily basis, demonstrating a very active and broad market for Vertex stock and permitting a very strong presumption of an efficient market;

(c)     As a regulated issuer, Vertex filed periodic public reports with the SEC;

(d)     Vertex regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     Vertex was followed by several securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period.  Each of these reports was publicly available and entered the public marketplace;

(f)     At all times during the Class Period, numerous National Association of Securities Dealers ("NASD") member firms were active market-makers in Vertex stock; and

(g)     Unexpected material news about Vertex was rapidly reflected in, and incorporated into the Company's stock price during the Class Period.

41.     As a result of the foregoing, the market for Vertex common stock promptly digested current information regarding Vertex from publicly available sources and reflected such information in Vertex's stock price.   Under these circumstances, all purchasers of Vertex common stock during the Class Period suffered similar injury through their purchase of Vertex common stock at artificially inflated prices, and a presumption of reliance applies.

## LOSS CAUSATION

42.     During the Class Period, as detailed herein, Defendants made false and misleading statements concerning Vertex's products and their success in clinical trials and engaged in a scheme to deceive the market.   This artificially inflated Vertex's stock price and operated as a fraud or deceit on the Class.   Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, Vertex's stock price fell precipitously, as the prior artificial inflation came out of the stock price over time.   As a result of their purchases of Vertex securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## FIRST CLAIM FOR RELIEF
### (For Violation of Section 10(b) of the 1934 Act
### and Rule 10b-5 Against All Defendants)

43.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

44.     Throughout the Class Period, Defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of Vertex common stock, knowingly or recklessly made materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

45.     During the Class Period, Defendants, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did:  (a) artificially inflate and maintain the market price of Vertex common stock; (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (c) cause Plaintiff and other members of the Class to purchase Vertex common stock at inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein in violation of §10(b) of the 1934 Act and Rule 10b-5, 17 C.F.R. §240.10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

46.     In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative false and misleading statements to the investing public, Defendants had a duty to promptly disseminate truthful information with respect to Vertex's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, so that the market price of the Company's securities would be based on

truthful, complete, and accurate information.  SEC regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

47.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them.

48.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Vertex common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Vertex common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by Defendants, or upon the integrity of the market in which the shares traded, Plaintiff and other members of the Class purchased Vertex stock during the Class Period at artificially high prices and were damaged thereby.

49.     Had Plaintiff and the other members of the Class and the marketplace known of the true facts, which were not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their Vertex shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

50.     By virtue of the foregoing, Defendants have violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.  17 C.F.R. §240.10-5.

## SECOND CLAIM FOR RELIEF
### (For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants)

51.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

52.     The Individual Defendants acted as control persons of Vertex within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their executive positions, board membership, and stock ownership, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and misleading.  The Individual Defendants were provided with, or had unlimited access to, the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

53.     In particular, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

54.     The Individual Defendants controlled Vertex.

55.     By reason of such wrongful conduct, the Individual Defendants and Vertex are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of these Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## THIRD CLAIM FOR RELIEF
### (For Violation of Section 20A of the 1934 Act)

56.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

57.     While Vertex securities traded at artificially inflated prices, Defendants Boger, Mueller, Silva, Ullian, and Wysenski personally profited by selling millions of combined dollars of Vertex shares between the May 7, 2012 false disclosure of fabricated test results and the May 28, 2012 first corrections of those results.  The below chart demonstrates the egregious stock sales by these Defendants:

| Defendant | Date of Sale | Amount of Shares | Profit |
|---|---|---|---|
| Boger | May 9, 2012 | 3,314 | $201,228.00 |
| Boger | May 16, 2012 | 4,000 | $252,943.00 |
| Boger | May 23, 2012 | 4,000 | $251,302.00 |
| Mueller | May 7, 2012 | 79,500 | $4,216,085.00 |
| Mueller | May 15, 2012 | 6,500 | $417,824.00 |
| Silva | May 9, 2012 | 56,295 | $3,425,781.00 |
| Ullian | May 9, 2012 | 20,000 | $1,211,600.00 |
| Wysenski | May 7, 2012 | 147,695 | $8,049,377.50 |
| Wysenski | May 8, 2012 | 38,009 | $2,360,406.65 |
| Wysenski | May 14, 2012 | 180,000 | $11,568,872.00 |
| | **TOTALS** | **539,313** | **$31,955,419.15** |

58.     Plaintiff and members of the Class traded contemporaneously with these Defendants by purchasing Vertex shares at artificially inflated prices and were damaged thereby.

59.     Plaintiff and all the other members of the Class who purchased Vertex stock contemporaneously with the sales of Vertex stock by these Defendants:

(a)     Have suffered substantial damages by paying artificially inflated prices for Vertex stock as a result of violations of §10(b) of the 1934 Act and Rule 10b-5 herein described; and

(b)     Would not have purchased Vertex stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated and/or distorted by Defendants' false and misleading statements.

60.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages.

61.     By reason of the foregoing, Defendants Boger, Mueller, Silva, Ullian, and Wysenski violated §20A of the 1934 Act and are liable to Plaintiff and the other members of the Class for the substantial damages they suffered in connection with their purchase of Vertex stock during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A.     Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding Plaintiff and other members of the Class damages together with interest thereon;

C.     Awarding Plaintiff and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees, and other costs and disbursements;

D.     Ordering the Individual Defendants to disgorge their insider trading proceeds, including a constructive trust over those proceeds; and

E.      Awarding Plaintiff and other members of the Class such equitable/injunctive or other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  September 6, 2012                         SCOTT+SCOTT LLP


/s/ Joseph P. Guglielmo
JOSEPH P. GUGLIELMO (JG671410)
DONALD A. BROGGI
JOSEPH D. COHEN
500 Fifth Avenue, 40th Floor
New York, NY 10110
Tel.: (212) 223-6444
Fax: (212) 223-6334
jguglielmo@scott-scott.com
dbroggi@scott-scott.com
jcohen@scott-scott.com

-and-

DAVID R. SCOTT
AMANDA F. LAWRENCE
156 South Main Street, P.O. Box 192
Colchester, CT 06415
Tel.: (860) 537-5537
Fax: (860) 537-4432
drscott@scott-scott.com
alawrence@scott-scott.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Glenn S. Klocko, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.      I am the Comptroller and Trustee of the City of Bristol Pension Fund (the "Bristol Pension Fund").

2.      I have reviewed the Complaint in this matter and authorize Scott+Scott LLP to file a complaint and to file lead plaintiff papers in this matter.

3.      The Bristol Pension Fund is willing to serve as a representative party on behalf of the purchasers of Vertex Pharmaceuticals Incorporated ("Vertex") securities during the Class Period, including providing testimony at deposition and trial, if necessary.

4.      During the Class Period, the Bristol Pension Fund purchased the Vertex securities that are the subject of the Complaint as set forth on the attached Schedule A.

5.      The Bristol Pension Fund did not engage in the foregoing transactions at the direction of counsel, or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6.      During the three-year period preceding the date of my signing this Certification, The Bristol Pension Fund has served or sought to serve as a representative party or lead plaintiff on behalf of a class in a private action arising under the Securities Act or the Exchange Act in the following cases:

> *City of Roseville Employees' Retirement System v. Nokia Corporation, et al.*, 1:10-cv-00967-GBD (S.D.N.Y.) (moved to be appointed as lead plaintiff but was not appointed.)

> *City of Royal Oak Retirement System v. Juniper Networks, Inc., et al.* 5:11-cv-04003-LHK (N.D. Cal.) (moved to be appointed as lead plaintiff and was appointed.)

> *Smilovits v. First Solar Incorporated, et al.* 2:12-cv-00555-DGC (D. Ariz.) (moved to be appointed as lead plaintiff but was not appointed.)

7.      The Bristol Pension Fund will not accept any payment for serving as a representative party on behalf of the class beyond its *pro rata* share of any recovery, except for such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

1

I declare under penalty of perjury that the foregoing is true and correct.  Executed at _____
_____.  (city, state)

THE CITY OF BRISTOL PENSION FUND

9/5/12
_____
Date

*Glenn S Klocko*

Glenn S. Klocko
Comptroller and Trustee

2

## SCHEDULE A

THE CITY OF BRISTOL PENSION FUND

Class Period Transactions in Vertex Pharmaceuticals Incorporated
(Class Period: 5/7/2012 through 6/27/2012)

| Trade Date | Action (Buy/Sell) | Quantity | Price Per Share |
|------------|-------------------|----------|-----------------|
| 5/30/2012 | Buy | 30,000 | $60.16 |