UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF BRISTOL PENSION FUND, On Behalf of Itself and All Others Similarly Situated, | No. 1:12-cv-11654-FDS |
| Plaintiff, | <u>CLASS ACTION</u> |
| vs. | AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| VERTEX PHARMACEUTICALS INC., JOSHUA BOGER, Ph.D., JEFFREY LEIDEN, M.D., Ph.D., PETER MUELLER, Ph.D., PAUL SILVA, ELAINE ULLIAN, AND NANCY J. WYSENSKI, | |
| Defendants. | <u>DEMAND FOR JURY TRIAL</u> |

1.      Lead Plaintiff City of Bristol Pension Fund ("City of Bristol" or "Lead Plaintiff") alleges the following based upon the investigation of Lead Plaintiff's counsel, which included, among other things, a review of the Defendants' public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Vertex Pharmaceuticals, Inc. ("Vertex" or the "Company"), securities analysts' reports about the Company, conversations with former Vertex employees and/or confidential witnesses ("CW"s), and information readily available on the Internet.   Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

2.      This is a securities fraud class action on behalf of all persons or entities that purchased or otherwise acquired the common stock of Vertex between May 7, 2012 and June 28, 2012 (the "Class Period").   The action is brought against Vertex, Director Joshua Boger ("Boger") (also the Company's founder), Chief Executive Officer Jeff Leiden ("Leiden"), Executive Vice President and Chief Scientific Officer Peter Mueller ("Mueller"), Senior Vice President and Corporate Controller, Paul Silva ("Silva"), Director Elaine Ullian ("Ullian"), and Executive Vice President and Chief Commercial Officer, Nancy Wysenski ("Wysenski") (collectively "Defendants") for violations of the federal securities laws for making false and misleading public statements concerning Vertex's products VX-809 and Kalydeco during the Class Period.[1]

---

[1]      Defendants Boger, Leiden, Mueller, Silva, Ullian, and Wysenski are collectively referred to herein as the "Individual Defendants."

3.      Vertex is a biotechnology company founded by Boger in 1989 and headquarted in Cambridge, Massachusetts.  Its stated mission is to cure patients with previously incurable diseases.  To do so, it researches and develops medications primarily focused on viral infections, autoimmune disorders, inflammatory diseases, and cancer.  In 1998, it began working on drugs to combat Cystic Fibrosis ("CF").

4.      Vertex received Food and Drug Administration ("FDA") approval for its medication "Kalydeco" in early 2012.  Kalydeco is targeted at treating the causes, rather than merely the symptoms, of CF.  As Kalydeco, by itself, only treats persons with a rare form of the disease, Vertex began a series of phased testing of the medication in combination with another of its experimental drugs, VX-809.  Soon after receiving approval and before conclusion of any definitive testing, however, Defendants capitalized on the potentially revolutionary nature of its medication for their own gain.

5.      Throughout 2011, Vertex experienced escalating losses in the market battle for Hepatitis C drugs and needed to change its focus and strategy in order to remain competitive.  In fact, by early 2012, analysts speculated that Vertex's Hepatitis C drug would become "obsolete," having been "upstaged" by Pharmasset (acquired by Gilead Sciences) and Inhibitex (acquired by Bristol-Myers Squibb).  Their Hepatitis C drugs largely replaced Vertex's long-researched drug, effectively removing Vertex from the competitive landscape for Hepatitis C medications altogether.  Indeed, over 2011 and into early 2012, the price of Vertex stock dropped almost 40%.

6.      Desperate to stay alive and reinvent itself, Vertex shifted its focus and energies to CF.  To that end, at the start of the Class Period on May 7, 2012, Vertex issued a press release announcing "interim data" from its Phase 2 study of VX-809 and Kalydeco that, according to the

Company, resulted in 46% of its treatment group experiencing "an absolute improvement" in lung function of five percentage points or more and 30% experiencing absolute improvement of ten percentage points or more.   At a press conference hastily convened the same day, the Individual Defendants hawked the striking and purportedly unanticipated interim results – indeed, a significant improvement in lung function was not even a scheduled end point for the Study -- with Mueller the Chief Scientific Officer, remarking – "10% absolute improvement, I must say I have never seen anything like this.  This is fantastic."  These "fantastic" (and untrue) test results caused Vertex's stock price to soar, with a one day increase in the Company's stock price of close to 50%.  That same day, the Individual Defendants began cashing in, capitalizing on the fabricated rise in stock price to the tune of almost ***$30 million in insider trading.***  These suspiciously timed sales were labeled by one United States Senate member as "a potentially troubling issue for investors in the pharmaceutical industry and for the federal government."

7.      Within weeks, in a series of appearances made by the Individual Defendants, Vertex disclosed that the test results had been misread, and that the announced improvement percentages were "relative" rather than absolute values, an inexplicable and fundamental error that reduced the seeming significance of the interim results.  Nonetheless, Leiden reassured the market that these lower lung function improvement results did not alter the prospects of the combination therapy, because all the test results were "consistent," and remained statistically robust.

8.      Defendants' statements were false, misleading and failed to convey negative information either known or recklessly disregarded by Defendants.   Despite Defendants' insistence that the results were "consistent", the reality was that any "positive" results were actually driven by outliers and tied to the timing of antibiotics cycles.  In truth, therefore, the

"revolutionary" study consisted of two patients improving drastically, and costly and long-researched medications merely replacing antibiotics that have long been used on CF patients.

9.      While the Individual Defendants profited off of the false information related to the phased trials, public investors, including Plaintiff, did not fare so well.  When, at the end of June 1012, the Company issued final Phase II results, and revealed the true prospects for the previously highly touted combination therapy, the Company's stock price plummeted from its previous close of $61.11 on June 27, 2012, to a close at $51.18 per share on June 28, 2012.  The Class Period stock price inflation was due to Company specific misstatements as the S&P 500 Index was relatively flat on a comparative basis during this same period.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under §§10(b), 20(a) and 20A of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b), 78t(a), and 78t-1, and Rule 10b-5, 17 C.F.R. §240.10b-5.  Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.

11.      Venue is proper in this district pursuant to §27 of the 1934 Act.  Acts and transactions giving rise to the violations of law complained of occurred in this district.

## THE PARTIES

12.      Plaintiff City of Bristol purchased Vertex common stock during the Class Period as described in the attached certification and was damaged thereby.

13.      Defendant Vertex is a biotechnology company headquartered at 130 Waverly Street, Cambridge, Massachusetts.  Vertex researches, develops, and commercializes medicine for viral diseases, inflammation, autoimmune diseases, cancer, pain, and CF.  During the Class Period, Vertex had approximately 211 million shares of common stock outstanding, which shares traded in an efficient market on the NASDAQ National Market System.

14.     Defendant Joshua Boger, Ph.D. founded Vertex in 1989 and served as its Chief Executive Officer from 1992 until May 2009, as well as Chairman of the Board from 1997 until 2006.  During the Class Period, Boger served as a Director of the Company and sold roughly $700,000 in Company stock.  Upon information and belief, Boger resides in Massachusetts.

15.     Defendant Jeffrey Leiden, M.D., Ph.D., became a member of the Vertex board of directors in 2009 and its President and Chief Executive Officer ("CEO") in December 2011.  He is the former President and Chief Operating Officer of Abbott Laboratories.  Upon information and belief, Leiden resides in Massachusetts and Florida.

16.     Defendant Peter Mueller, Ph.D., has been the Chief Scientific Officer and Executive Vice President of Global Research & Development at Vertex since July 2003 and May 2009, respectively.  During the Class Period, Mueller sold over $4.4 million of Company stock.  Upon information and belief, Mueller resides in Massachusetts.

17.     Defendant Paul Silva joined Vertex in 2007 as a Senior Director and then became Vice President and Corporate Controller in 2008, a position he held until April 2011.  During the Class Period, Silva sold almost $3.5 million in Company stock.  Upon information and belief, Silva resides in Massachusetts.

18.     Defendant Elaine Ullian has served as a director of Vertex since 1997 and is the Company's co-lead independent director.  During the Class period, Ullian sold over $1.2 million in shares.  Upon information and belief, Ullian resides in Massachusetts.

19.     Defendant Nancy J. Wysenski served as the Chief Commercial Officer and Executive Vice President of Vertex from December 2009 to June 2012.  During the Class Period, Wysenski sold *almost $22 million in stock.*  Upon information and belief, Wysenski resides in Massachusetts.

20.     Defendants Boger, Leiden, Mueller, Silva, Ullian, and Wysenski ran Vertex as "hands-on" managers dealing with important issues at the Company, including new product development, the marketing of Vertex products, and monitoring the performance and sales of Vertex's products.  Each issued the false and misleading press releases or otherwise made false and misleading statements, with knowledge or in reckless disregard of their truth.

## BACKGROUND

21.     Vertex is the 23rd largest biotechnology company in the world by revenue.  It researches, develops, and commercializes medicine for viral diseases, inflammation, autoimmune diseases, cancer, pain, and CF.  The company engages in discovering, developing, manufacturing, and commercializing small molecule drugs for the treatment of serious diseases worldwide.  Its products include prescription medicines used for the treatment of patients with Hepatitis C, HIV, and influenza, among other afflictions.  The products are marketed worldwide with networks in the United Kingdom, Japan, and Belgium.  Many of its revenues are derived from royalties and net sales from collaborative agreements with other companies, including GlaxoSmithKline, Johnson & Johnson, and Merck.  Founded in 1989 by Defendant Boger, Vertex is headquartered in Cambridge, Massachusetts.

22.     In 2011, Defendant Leiden took over as CEO of Vertex.  According to a former science director who was employed by Vertex for three years prior to 2012 ("CW1"), at the same time, a shift in company policy began.  That shift stressed results rather than process and lead to Vertex being "more risky" and actually having an increased appetite for risk.  In fact, CW1 stated that "all technical expertise" that expressed questions about management directives was "shut down" or "shut up."  CW1 further opined that there was definitely a lack of internal

controls regarding data analysis and a culture that gave rise to mistakes, beginning with Leiden's promotion.

23.    Around the same time, in late 2011 to early 2012, Vertex shares dropped almost 40% in value on signs that competitors were gaining ground in the field of medications for Hepatitis C and practically edging Vertex out of that field.  Vertex, to stay alive and competitive, needed to shift its focus.  Conveniently, concurrently, in January 2012, Vertex gained approval for the drug Kalydeco.  That approval, however, was only for patients with a specific genetic mutation—a group that accounts for approximately 4% of those with CF.  Therefore, Vertex began exploring the combination of Kalydeco with other medications or therapies to treat those with more common forms of CF.  Specifically, Vertex sought to target patients with CF who had two copies – also known as "homozygous" – of the most common mutation in the cystic fibrosis transmembrane conductrane regulator ("CFTR") gene, known as F508del.

24.    As background, CF is a fatal lung disease that claims about 500 lives each year, with 1,000 new cases diagnosed annually.  In the United States, approximately 30,000 individuals have CF, making it one of the most widespread fatal genetic diseases.  CF is a genetic disease that's caused by mutations to a certain gene that functions to encode chlorine channels that line the airway cells in the lungs.  Without that channel, the lungs clog up with abnormally thick and sticky mucous.  This mucus builds up in the breathing passages of the lungs and in the pancreas, resulting in life-threatening lung infections and serious digestion problems.  Breathing problems generally worsen as an individual ages, often requiring double lung transplantation.  Unfortunately, CF is a fatal disease; individuals normally die of lung complications.  The average life expectancy of someone with CF is only 37 years.  There is, as of yet, no cure for CF.

25.     Relevant to Vertex's CF medications, there are several forms of CF.   Some patients have a form of CF as defined by the "G551D" mutation.   In this form, proteins do travel to the surface of airway cells, but once there, they do not function properly.   Vertex's drug, Kalydeco, allegedly assisted in restoring the protein function, enabling it to act properly as a chloride channel resulting in decreased mucous and increased breathing ease.   The majority of CF patients, however, have the "F508del" mutation which causes proteins to not even travel to the surface of the lungs.   In order for Kalydeco to even attempt assistance, the proteins first need to traffic to the surface.   Vertex therefore attempted a "combination therapy" whereby a corrector compound called VX-809 was administered first to help traffic proteins to the cell surface, followed by dosages of Kalydeco to assist in increasing the function of those proteins.

26.     More specifically, Vertex's study enrolled 108 patients for its Phase II trial of VX-809 and Kalydeco.   Of these, only about 37 patients were included in the interim test results. Of the 108 patients, there were five "arms": three that took varying doses of VX-809 (200, 400, and 600 mg) for 28 days followed by 28 days of Kalydeco; one "placebo" group; and one group of "heterozygous" (a less common form of the F508del mutation) patients.   Thus, each arm had only about 20 patients in it.   All patients were taking antibiotics where they were on cycles that included times when the patients were on antibiotics for a period of weeks and then were taken off the antibiotics.   While it is normal for CF patients to undergo alternating series of antibiotic treatments, patients tended to deteriorate when off the antibiotics, which itself could explain changes in their short term lung function.

27.     CF research focuses on two specific markers – lung function and sweat chloride. As cystic fibrosis involves a chronic, progressive obstruction of the lungs, pulmonary function is an important marker of CF lung disease severity.   To measure lung function, the measure of

"Forced Expired Volume" ("FEV") is used.  In particular, the FEV after one second of blowing

out ("FEV1") is widely employed in clinical and research arenas for CF.  However, CF also

results in the tissues of the sweat glands not working properly.  For healthy individuals, sodium

and chloride channels (CFTRs) work properly to create sweat with the normal concentrations of

sodium and chloride.  In cystic fibrosis, the CFTRs are defective, and do not allow chloride to be

reabsorbed into sweat duct cells. The concentration of chloride in sweat is therefore elevated in

individuals with cystic fibrosis.  Therefore, another measurement of CF progression is reduced

sweat chloride.  Sweat chloride measurement has been described now as the "gold standard" for

CF clinical research.

28.     These two markers have been used in CF research which has drastically

progressed over the century.  In 1959, the median age of survival of children with CF in the

United States was six months.  Since then, great strides have not only increased the life span of

CF patients, but also has developed several treatment methods that enable individuals with CF to

have a fuller life less encumbered by their condition.  In 1989, the CF gene was discovered,

which has enabled scientists to attempt gene therapy.  With the potential cure for CF ostensibly

close, numerous clinical research trials and developmental drugs have arisen. Indeed, CF is

currently estimated to be a $3 to $4 billion market that affects 70,000 persons world-wide.  As

CF is such a tragic disease that is seemingly near to a cure, any potential "blockbuster" news will

trigger excitement.  CF thus provided the perfect opportunity for Vertex to reinvent itself from

Hepatitis C research, where it was being eviscerated by competitors.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND SCHEME TO DEFRAUD DURING THE CLASS PERIOD

29.     The Class Period begins on May 7, 2012 when Vertex, in a rush to move its study

of combining the experimental drug VX-809 and Kalydeco to treat CF patients with homozygous

F508del genes to regulatory approval and Phase III testing, announced its interim Phase II results.   Desperate to prove itself after Hepatitis C losses, and to provide a vehicle for the Company's senior officers and directors to cash in on sales of their stock, Defendants issued preliminary results to allow Vertex to fast-track its CF study.   In particular, Defendants announced that Vertex had achieved strikingly successful results in its clinical Phase 2 study.   Its May 7, 2012 press release is titled, "Interim Data from Phase 2 Combination Study of VX-809 and KALYDECO ™ (ivacaftor) Showed Significant Improvements in Lung Function (FEV1) in People with Cystic Fibrosis Who Have Two Copies of F508del Mutation."   That press release announced that the Company had analyzed results after "approximately half of the study patients had completed 56 days of treatment" and went on to state:

> Of those who received VX-809 and KALYDECO (250 mg, q12h), approximately ***46 percent (17/37) experienced an absolute improvement*** from baseline to Day 56 in lung function of 5 percentage points or more, and approximately ***30 percent (11/37) experienced an absolute improvement*** from baseline to Day 56 of 10 percentage points or more.   None of the patients treated with placebo (0/11) achieved a 5-percentage point or more improvement from baseline to Day 56 in lung function.   Most adverse events were mild or moderate in severity and comparable between treatment and placebo groups.

[Emphasis added.]

30.    The press release went on to quote Vertex executive Dr. Christopher Wright as stating "[f]or the past 14 years, our teams have focused on learning about the underlying cause of cystic fibrosis so we can develop new medicines to help as many patients as possible.   Today we believe we're one step closer to this goal."   He also stated that the results "exceeded our expectations."

31.    The same press release, while touting the perceived lung function results, buried the information on sweat chloride testing in the middle of the long release and ultimately stated that the "reductions were not statistically significant."

32.     Meanwhile, Defendants held a conference call that same day where Defendants Leiden, Mueller, and Wysenksi spoke.   Defendant Mueller, Vertex's Chief Scientific Officer, effusively presented the lung improvement data:

> So we have seen the population statistics which is the percent of the people in the course of 56 days show more than a 10% improvement and this is I think really, really fantastic for me and that is what I have never – 10% absolute improvement, I must say I have never seen anything like this.  This is fantastic.

33.     On that same call, Defendant Leiden explained the effects of these extraordinary interim results, both in terms of patient care and the improved prospects of a commercial blockbuster for Vertex:

> We're very pleased to have obtained these results because of what they could mean to patients with CF.  There's also a practical aspect to the interim results that I want to touch upon.

> This result is driving us to accelerate our investment into a pivotal program and to plan for potential market entries sooner than we had previously planned.  We are aligning our teams internally and tasking them with collaborating with regulators and trial investigators to review our data and preparing for a pivotal study.

> I'd like to close with a final comment about the breadth and future potential of our business.  There's a long-term strategic aspect to today's data from a patient and disease perspective and also from a corporate commercial perspective.   Vertex launched INCIVEK in 2011, and in less than one year after launch we've taken a leadership position in Hepatitis C.  Three months ago we launched KALYDECO in CF and we've already seen strong uptake in the G551D population.  These two medicines have provided Vertex with significant cash flows which have allowed us to reinvest in our pipeline to create future breakthrough medicines while also creating significant earnings.

> Today's results represent more fruits of that reinvestment.  Pending final data this summer and discussions with regulators, we look forward to accelerating the development of our CF combination regimen for homozygous Delta 508 CF patients.

At the same time, Wysenski reminded analysts that the unserved market for patients who are homozygous and stood to benefit from this combination product exceeded 70,000 patients, a market involving billions of dollars of potential sales.

34.     Michael Partridge, Vertex VP, reiterated Leiden's comments by stating that: "These early data exceeded our expectations and have accelerated the plans for this development program.   These data allow us to move forward quickly with the next step…"   Defendant Wysenski touted the size of the potential market for the new combination medications.

35.     Likewise, on a call the next day, May 8, 2012, Ian Smith, CFO stated:

That is what drove us to the announcement—the acceleration of this program, and the data being beyond our expectations to drive as quickly into a phase III program with the confidence to run a phase III program around an FEV end point. ***Very, very important result.  So that's what we are planning on back to the company.  There is a lot of activity.  People are being unblinded, discussions with the FDA, discussions with the European authorities.  It is a high priority for us.***

The opportunity to expand beyond maybe the 8% to 10% of patients we already think have an opportunity for Kalydeco, but to go to the homozygote patients, for the potentially 50% of 70,000 patients, but to get to those patients as fast as possible with this combination therapy is imperative for the company.

[Emphasis added.]

36.     The Company's stock price rose precipitously on this news, increasing from a closing price of $37.41 per share on May 4, 2012 to close at $58.12 per share on May 7, 2012, on volume ***40 times higher than the average trading volume***.

37.     Announcement of the interim results in the VX-809 and Kalydeco study was received very favorably by the public.   Indeed, Vertex shares soared on the belief that the Company could have a multibillion-dollar franchise in the treatment of CF and had rebounded from its Hepatitis-C losses.   The results exceeded expectations and made it appear to the public that Vertex – whose shares were under pressure as its competitors were outperforming in the Hepatitis C market – had great prospects.   That day, an ISI analyst opined that Vertex could have a ***$4 billion franchise in CF – calling the data "excellent and much better than expected."***

Similarly, that same day a UBS analyst wrote that "…we see this as a blockbuster opportunity for Vertex" with potential for more than $1 billion in sales in 2016.

38.     As Defendants continued heralding the positive and "unexpected" interim Phase 2 study results, the Company's stock traded as high as $64.94 on May 25, 2012, closing at $64.85. Quickly exploiting the bloated stock price stemming from the announcement of the false study results, Defendants Boger, Mueller, Silva, Ullian, and Wysenski collectively sold *tens of millions of dollars in stock* immediately following the announcement.  Indeed, on May 7 and 8 alone, Defendant Wysenski sold over *$10 million in shares.*  One week later, she sold another *$11.5 million in shares.*

39.     These suspiciously timed sales prompted Iowa Senator Charles Grassley to write to SEC Chairwoman Mary Shapiro, asking her to probe whether the Individual Defendants illegally profited unfairly from stock sales.  In his letter, Senator Grassley wrote "[i]t could appear that these Vertex [VRTX] executives potentially took advantage of the spike in the stock knowing the news of the clinical data being overstated would be made public eventually, which in turn would negatively affect the stock value."

40.     In fact, as discussed below, the statements in the May 7, 2012 press release were false and on May 29, 2012 the Defendants admitted that the improvements announced were "relative" rather than "absolute" percentages, meaning that they were less dramatic than originally thought.  Nonetheless, Defendants continued on May 29th and May 30th to spin even these corrected results, insisting that they continued to support the earlier success story because of their "consistency," yet another false and misleading portrayal of the interim study results and the prospects for a viable treatment for CF.

41.     When faced with such study results that seemed too good to be true, Defendants, rather than checking the results turned a blind eye, accepting and promoting unlikely data that offered them a windfall on the sale of their stock.  By recklessly publishing suspect test results, Defendants were able to buoy the share price of Vertex which had just recently massively declined due to competition from other producers of Hepatitis C medications.  During the spike in the stock price resulting from the false and misleading statements, the Individual Defendants then rushed to sell of enormous amounts of stock for immense personal gains.

42.     CWs confirm this pattern of events.  As one former senior director at Vertex from 2004-June 2012 who was responsible for navigating Vertex through regulatory approval for Kalydeko ("CW2") explained, Vertex had the study results for at least two weeks prior to the press release on May 7, 2012.  Those results would have been sent to Defendant Wysenksi, among others, through the normal course of business.  Additionally, a committee of Vertex executives met to review the results to determine whether the information was material and warranted release.  Therefore, Defendants had access to the study results prior to their release and should have known or at least verified that the suspect results were unrealistic and unreliable.

43.     Indeed, as explained by CW1, individuals at the Company were **_highly_** skeptical of the applicable study because there was a noted lack of sweat chloride improvements – the "gold standard" for CF research.  Therefore, the data announced on May 7, 2012 was just "too beautiful" and Defendants would have known that the results were out of the ordinary and needed to be checked.  In fact, Defendant Mueller, on the May 7 results call, himself stated that "10% absolute improvement, I must say I have never seen anything like that . . ."  As the Chief Scientific Officer for Vertex, Mueller acted with willful blindness in not verifying the accuracy

of the results that seemed too good to be true.  Instead of questioning and confirming the suspect results, Mueller exploited their uncertainty and sold $4.4 million of his own stock.

44.   A former Vertex employee who worked in analytical development from October 2011 to October 2012 ("CW3") confirmed this, explaining how it was actually known "for some time" within Vertex that VX-809 actually caused Kalydeco to "work less well" as it had an induction effect whereby the VX-809 stimulated an enzyme that caused Kalydeco to metabolize faster.  Studies had shown that the less time Kalydeco spent in the body, the less well it worked. Therefore, VX-809, by increasing the metabolic rate, decreased the effectiveness of Kalydeco. This was well known at the Company prior to the May 7, 2012 press release.  Given the fact that the study included only 37 patients (half of the patients in four of the study "arms"), Defendants could easily have confirmed the percentage improvement calculations reported by Vertex's vendor, simply by reviewing the results, actually reported, patient by patient.

45.   Defendants, in a rush to proceed to Phase III, move for regulatory approval, prove Vertex's competitiveness, and thereby inflate the price of their stock which they then quickly sold off, recklessly announced the false Phase II interim study results on May 7, 2012, explaining the "too beautiful" aspect as merely "exceeding expectations."  The Defendants also downplayed the concerns surrounding the lack of improvement in sweat chloride and concealed the induction effect of VX-809 they observed.  Furthermore, as explained by CW3, there were two patients in particular that had "high positive results" that were actually driving the interim results as to FEV1.  Defendants knew, or were reckless in not knowing, that these patients were "outliers" and were required to disclose these facts so that their portrayal of the success and consistency of their test results did not mislead investors.

46.     In sum, Defendants' statements in the May 7, 2012 press release and on subsequent calls were false and misleading because Defendants knew, or were reckless in not knowing, that the absolute improvement percentages were "too good to be true," that even the corrected levels of improvement were driven by outliers and the effects of changes in their patients' antibiotic cycles, and that the data regarding the effects of the combination therapy was inconsistent, particularly given the lack of meaningful changes in sweat chloride amounts and the observed induction effect.

47.     On May 29, 2012, the Company issued a press release "correcting" the interim analysis of Phase 2 Combination Study of VX-809 and Kalydeco.  That press release stated that, in fact:

> The actual absolute improvements in lung function for these patients are: approximately 35 percent (13/37) experienced an absolute improvement of 5 percentage points of more and approximately 19 percent (7/37) experienced an absolute improvement of 10 percentage points or more from baseline to day 56.

48.     To minimize the effect on the market of the revision to the reported improvement results, Defendants also released further data indicating that – of half the patients in the study – they had found an 8.5% mean absolute improvement in FEV1 compared to the placebo group and that the placebo group saw a 4.5% decline in FEV1 over the same time period.

49.     On a conference call that same day, where Defendants Leiden and Mueller spoke, the Company stated that the correction was due to a "misinterpretation" between Vertex and a third-party statistical analysis vendor over whether the data showed an *absolute* change in lung function or a *relative* one.  According to Leiden, "Vertex is a company that prides itself on our scientific rigor and our scientific integrity."

50.     Defendants' mistake, however, was fundamental and inexplicable, given the importance of the information the Company was reporting.  According to CW2, the individual at

Vertex tasked with receiving the raw data, a pulmonologist by trade, should have known about the suspect nature of the data, regardless of how it was presented by the vendor.   "Relative" means a percentage change from baseline, whereas an absolute improvement is the numerical distance between the baseline measurement and the improved measurement.   Therefore, the numbers fell from 46% to 35% and from 30% to 19%.   The May 29, 2012 press release is completely silent on sweat chloride.

51.     Tellingly, the Company refused to disclose the purportedly culpable vendor. However, as CW1 and CW2 explained, there actually was no vendor error.  Any alleged "error" was internal.

52.     However, Defendants obscured both their own recklessness in failing to confirm suspect data and the impact of the corrections to the numbers.  For example, on a conference call that day, Defendant Leiden called the news "disappointing" but said that the final data – which would be released soon – "will trump all of this and will be able to tell you much more definitively about where we are."

53.     Similarly, on a call the next day, May 30, 2012, Leiden stated that "…nothing changed in our conclusions about the data, about the activity of the combination in patients with CF, and certainly not about our plans to progress the combination to pivotal Phase 3 trials as quickly as possible."  He went on to say that: "Our view of the data hasn't changed with the correction.  And most important, our plans haven't changed."

54.     On that same call, Leiden went on to explain why, as revised, the test results remained important and reliable:

> So, the way we look at Phase 2 trials is I always like to look at the data five or six different ways and what I'm looking for is do I see consistent trends and are those trends backed up by statistics.  And when you look at this dataset, whether you're looking at treated versus placebo, treated versus baseline, responder analysis,

individual patient analysis, all the things that we disclose, ***and what we're seeing is a consistent trend of activity of the combination, and remarkably to me, and this is where it exceeded our expectations and continues to do so those trends are not only statistically significant but highly statistically significant, with a p of 0.002 which means there's only a two in 1,000 chance that the results are random. And that's why we have such confidence in this combination.***

[Emphasis added.]

55.     Defendants' statements touting the consistency of the test data and trends, while concealing contrary facts, and asserting misleading levels of statistical significance that relied upon the undisclosed variability in two patients' results, served to appease the market, leading one analyst to write, on May 29, 2012: "[w]hile the new results are less robust than originally disclosed, they still likely support the same blockbuster opportunity and we expect future disclosures should reduce clinical/regulatory risk and drive shares higher."

56.     Similarly, on May 30, 2012, another analyst wrote: "***We are not making any changes to our model or price target at this time.*** The interim analysis update was the result of a miscommunication between VRTX and its outside contractor. This is highly unusual. Nevertheless, VX-809 still looks like an approvable drug that will change CF patients' course of disease. If VX-809 is ultimately approved for a smaller population, the price charged may be higher than we modeled and still represents a multiple billion dollar franchise with Kalydeco."

[Emphasis added.]

57.     However, Defendants' May 29 and May 30 statements were false and misleading because they again relied upon a study that was driven by inconsistencies in data, particularly on two "outliers," and the fact that differing antibiotic cycles and effects contributed to the unreliability of the results from an extremely small study universe. Thus, Leiden's statement that there were "consistent trends" was false, or at least misleading without disclosure of the contrary and inconsistent facts. Additionally, the statements failed to disclose the "induction effect" and

the lack of meaningful sweat chloride amounts with VX-809 combination therapy, which further rebutted the purported consistency of the data and trends.

58.    Defendants' newly offered "statistics" indicating that there was only a 2 in 1,000 chance that the study results were random, failed to consider or disclose facts otherwise indicating that the results were unreliable or had a different explanation.

59.    As explained by the former Vice President of Global Medical Affairs from 2007 through September 2012 ("CW4"), the 4.5% decline in the lung function of the placebo group numbers was largely driven by the antibiotics cycle in that, each time a patient stops antibiotics, lung function decreases.   Therefore, given the timing of the study's antibiotic cycle, it is expected that the placebo group – on no medication – would have a decrease from baseline when antibiotics were still in the system.   Therefore, at best, the VX-809/Kalydeco combination merely served to replace the effects of antibiotics in a highly costly and overhyped manner. Defendants failed to disclose this when touting the 8.5% comparison figure and the 4.5% placebo decrease number.

60.    Defendants' statements were thus false and misleading for numerous reasons.  While insisting that all data and results were "consistent," Defendants failed to disclose the inconsistent data and aspects of the study, namely:  there was not a meaningful change in sweat chloride amounts which was a primary endpoint of the Phase II study; that the variability in the rate of improvement was an "inconsistency" and the high reported improvement rate was driven by two patients that skewed the results; and that, given the antibiotic regimen associated with CF treatment, large swings in lung function were to be expected so that Vertex's convoluted regimen merely replaced antibiotics.  Any of those factors would have been enough to neutralize

19

the positive findings since the interim results were based upon a tiny test sample of only 37 patients.

61.     Thus, through May 2012, Defendants managed to keep Vertex stock price high by continuing to represent that Vertex had found a viable and highly profitable niche in the combination Kalydeco and VX-809 project that would be worth over $4 billion.  The motive for this scheme is apparent as Defendants succeeded in selling over $30 million in their own stock before the truth came to light.

## THE TRUTH IS REVEALED

62.     On June 28, 2012, Vertex announced the "final results" of its Phase 2 study of VX-809 and Kalydeco and suddenly changed the parameters of the study and no longer reported percentiles of "absolute improvement" over a 56 day period.  Instead, the press release issued that day stated that, "[f]rom Day 28 to 56, when the treatment groups received the combination of VX-809 and KALYDECO, there was a mean absolute improvement in lung function in each of the treatment groups, while lung function continued to decline for the placebo group."  The press release then gives the actual numbers for sweat chloride, reporting them as not statistically significant.

63.     On a conference call held the same day where Defendants Leiden and Mueller spoke, Defendants told analysts that even though it did not give "exactly comparable results" (*i.e.*, absolute improvement over 56 days), the results it did present should be able to speak alone and justify more testing.  However, the Company refused to give any comparable results.  Understandably, the ambiguity and uncertainty around the final results caused investor skepticism.

64.     On that call, one Bernstein analyst asked for comparable information from day 0-56 rather than simply from day 28-56.   Ian Smith responded simply: "…unfortunately, the answer is that we're not going to add to that data at this point."

65.     A Reuters article from that same day reported:

(Reuters) - Vertex Pharmaceuticals Inc (VRTX.O) said its combination CF treatment significantly improved patient lung function in a mid-stage clinical study, but *investor skepticism about how the results were presented and over the strength of the data itself sparked a sharp selloff of company shares*.

Vertex shares closed down 16.2 percent at $51.18 on Thursday and were off as much as 21.7 percent at the depth of the selloff.

The data was the final results from a Phase II study of Vertex's CF drug Kalydeco in combination with an experimental drug, VX-809.   Interim results from the trial presented last month sent the company's shares soaring as they appeared to show a surprisingly strong improvement in lung function in patients with the life-shortening disease.

Some of those gains were later lost after the company was forced to revise the data due to a statistical mistake in which it confused relative with absolute results.   *The final results presented on Thursday contained ambiguities that further unsettled investors*.

"*This is now the third and most confusing disclosure about a relatively small study, and this one raises even more questions about management's transparency and credibility*," said Sanford Bernstein analyst Geoffrey Porges, who has been a strong supporter of Vertex in the past.

In particular, the company did not present exactly comparable results between the interim and final data.

*"This non apples-to-apples disclosure has created investor doubt that the data are 'real,'"* said Mark Schoenebaum, an analyst at ISI Group, in a research note.

Company executives told analysts on a conference call that even though it did not present exactly comparable results, the final results should stand alone and indicate the treatment is effective at the highest VX-809 dose of three tested.   Vertex said the results warrant moving forward into late-stage clinical development, which it plans to begin in early 2013.

"At the interim analysis they encouraged everybody to focus on the difference between day zero - the start of treatment - and day 56 - the end of treatment - which is a logical approach.   But in final analysis they asked everyone to focus on halfway through the study at day 28 and day 56," Porges said.

"*They (Vertex management) believed that they could move the goal posts on the disclosure, spin the story heavily in their favor and not see a reaction.   I don't think that they'll believe that after today."*

The company declined to comment on the steep drop in its share price.

Kalydeco, which in January became the first drug approved to treat the underlying cause rather than symptoms of the serious lung disease, helps about 4 percent of CF patients with a specific gene mutation.

Vertex is hoping that the drug, when combined with VX-809, will eventually be able to treat the larger CF population.

CF causes the thin layer of mucus that helps keep lungs free of germs to thicken, clogging airways and damaging the lungs.  The average life expectancy for the disease is 37 years as damage to the lungs progresses, limiting the ability to breath.

[Emphasis added.]

66.    The final results caused the stock price of the Company to plummet from a close of $61.11 on June 27, 2012 to a close of $51.18 on June 28, 2012.

## CLASS ACTION ALLEGATIONS

67.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired Vertex common stock between May 7, 2012 and June 28, 2012 (the "Class").  Excluded from the Class are the Defendants, officers and directors of the Company as well as their families, and the families of the Defendants.  Class members are so numerous that joinder of them is impracticable.

68.    Common questions of law and fact predominate and include whether Defendants: (a) violated the 1934 Act; (b) omitted and/or misrepresented material facts; (c) knew or recklessly disregarded that their statements were false; (d) traded on inside information; and (e) artificially inflated the price of Vertex common stock and the extent of and appropriate measure of damages.

69.    Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

70.   At all relevant times, the market for Vertex's common stock was an efficient market for the following reasons, among others:

(a)   Vertex's stock met the requirements for listing, and was listed and actively traded on the NASDAQ National Market, a highly efficient and automated market;

(b)   According to the Company's Form 10-Q filed May 10, 2012, as of April 27, 2012, there were over 211 million shares of Vertex common stock outstanding.  During the Class Period, on average, more than 5 million shares of Vertex stock were traded on a daily basis, demonstrating a very active and broad market for Vertex stock and permitting a very strong presumption of an efficient market;

(c)   As a regulated issuer, Vertex filed periodic public reports with the SEC;

(d)   Vertex regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)   Vertex was followed by several securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period.  Each of these reports was publicly available and entered the public marketplace;

(f)     At all times during the Class Period, numerous National Association of Securities Dealers ("NASD") member firms were active market-makers in Vertex stock; and

(g)     Unexpected material news about Vertex was rapidly reflected in, and incorporated into, the Company's stock price during the Class Period.

71.     As a result of the foregoing, the market for Vertex common stock promptly digested current information regarding Vertex from publicly available sources and reflected such information in Vertex's stock price.   Under these circumstances, all purchasers of Vertex common stock during the Class Period suffered similar injury through their purchase of Vertex common stock at artificially inflated prices, and a presumption of reliance applies.

## LOSS CAUSATION

72.     During the Class Period, as detailed herein, Defendants made false and misleading statements concerning Vertex's products and their success in clinical trials and engaged in a scheme to deceive the market.   This artificially inflated Vertex's stock price and operated as a fraud or deceit on the Class.   Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, Vertex's stock price fell precipitously, as the prior artificial inflation came out of the stock price over time.   As a result of their purchases of Vertex securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## FIRST CLAIM FOR RELIEF
### (For Violation of Section 10(b) of the 1934 Act
### and Rule 10b-5 Against All Defendants)

73.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

74.     Throughout the Class Period, Defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of Vertex common stock, knowingly or recklessly made materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

75.     During the Class Period, Defendants, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period, did:  (a) artificially inflate and maintain the market price of Vertex common stock; (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (c) cause Plaintiff and other members of the Class to purchase Vertex common stock at inflated prices.   In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein in violation of §10(b) of the 1934 Act and Rule 10b-5, 17 C.F.R. §240.10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

76.     In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative false and misleading statements to the investing public, Defendants had a duty to promptly disseminate truthful information with respect to Vertex's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, so that the market price of the Company's securities would be based on truthful, complete, and accurate information.  SEC regulations S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.).

77.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were readily available to them.   In particular, each of the Defendants either reviewed and approved, or had the power and authority to review and correct errors in the false and misleading press releases, or participated in conferences where investors were misled.

78.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Vertex common stock was artificially inflated during the Class Period.   In ignorance of the fact that the market price of Vertex common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by Defendants, or upon the integrity of the market in which the shares traded, Plaintiff and other members of the Class purchased Vertex stock during the Class Period at artificially high prices and were damaged thereby.

79.     Had Plaintiff and the other members of the Class and the marketplace known of the true facts, which were not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their Vertex shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

80.     By virtue of the foregoing, Defendants have violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.   17 C.F.R. §240.10-5.

## SECOND CLAIM FOR RELIEF
### (For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants)

81.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

82.     The Individual Defendants acted as control persons of Vertex within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their executive positions, board membership, and stock ownership, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and misleading.  The Individual Defendants were provided with, or had unlimited access to, the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

83.     The Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

84.     The Individual Defendants controlled Vertex, and/or controlled other Individual Defendants who spoke falsely to analysts and investors.

85.     By reason of such wrongful conduct, the Individual Defendants and Vertex are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of these Individual

Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**THIRD CLAIM FOR RELIEF**
**(For Violation of Section 20A of the 1934 Act)**

86.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

87.     While Vertex securities traded at artificially inflated prices, Defendants Boger, Mueller, Silva, Ullian, and Wysenski personally profited by selling millions of combined dollars of Vertex shares between the May 7, 2012 false disclosure of fabricated test results and May 28, 2012.  The below chart demonstrates the egregious stock sales by these Defendants:

| Defendant | Date of Sale | Amount of Shares | Profit |
|---|---|---|---|
| Boger | May 9, 2012 | 3,314 | $201,228.00 |
| Boger | May 16, 2012 | 4,000 | $252,943.00 |
| Boger | May 23, 2012 | 4,000 | $251,302.00 |
| Mueller | May 7, 2012 | 79,500 | $4,216,085 |
| Mueller | May 15, 2012 | 6,500 | $417,824.00 |
| Silva | May 9, 2012 | 56,295 | $3,425,781.00 |
| Ullian | May 9, 2012 | 20,000 | $1,211,600.00 |
| Wysenski | May 7, 2012 | 147,695 | $8,049,377.50 |
| Wysenski | May 8, 2012 | 38,009 | $2,360,406.65 |
| Wysenski | May 14, 2012 | 180,000 | $11,568,872.00 |
| | **TOTALS** | **539,313** | **$31,955,419.15** |

88.     Plaintiff and members of the Class traded contemporaneously with these Defendants by purchasing Vertex shares at artificially inflated prices and were damaged thereby.

89.     Plaintiff and all the other members of the Class who purchased Vertex stock contemporaneously with the sales of Vertex stock by these Defendants:

(a)     Paid artificially inflated prices for Vertex stock as a result of violations of §10(b) of the 1934 Act and Rule 10b-5 herein described; and

(b)     Suffered losses when the truth was revealed and the artificial inflation in the price of their stock was removed.

90.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages.

91.     By reason of the foregoing, Defendants Boger, Mueller, Silva, Ullian, and Wysenski violated §20A of the 1934 Act and are liable to Plaintiff and the other members of the Class for the substantial damages they suffered in connection with their purchase of Vertex stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A.     Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding Plaintiff and other members of the Class damages together with interest thereon;

C.     Awarding Plaintiff and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees, and other costs and disbursements;

D.     Ordering the Individual Defendants to disgorge their insider trading proceeds, including a constructive trust over those proceeds; and

E.      Awarding Plaintiff and other members of the Class such equitable/injunctive or other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury.


DATED:  February 11, 2013                            SCOTT+SCOTT,
                                                     ATTORNEYS AT LAW, LLP

                                                     /s/ Joseph P. Guglielmo
                                                     JOSEPH P. GUGLIELMO (JG671410)
                                                     DONALD A. BROGGI
                                                     The Chrysler Building
                                                     405 Lexington Avenue, 40th Floor
                                                     New York, NY 10174
                                                     Tel.: (212) 223-6444
                                                     Fax: (212) 223-6334
                                                     jguglielmo@scott-scott.com
                                                     dbroggi@scott-scott.com

                                                            -and-

                                                     DAVID R. SCOTT
                                                     AMANDA F. LAWRENCE
                                                     156 South Main Street, P.O. Box 192
                                                     Colchester, CT 06415
                                                     Tel.: (860) 537-5537
                                                     Fax: (860) 537-4432
                                                     drscott@scott-scott.com
                                                     alawrence@scott-scott.com

                                                     *Attorneys for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 11, 2013, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List.

<u>/s/ Joseph P. Guglielmo</u>
Joseph P. Guglielmo (BBO #671410)
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY  10174
Telephone:     (212) 223-6444
Facsimile:      (212) 223-6334
jguglielmo@scott-scott.com

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Glenn S. Klocko, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.  I am the Comptroller and Trustee of the City of Bristol Pension Fund (the "Bristol Pension Fund").

2.  I have reviewed the Complaint in this matter and authorize Scott+Scott LLP to file a complaint and to file lead plaintiff papers in this matter.

3.  The Bristol Pension Fund is willing to serve as a representative party on behalf of the purchasers of Vertex Pharmaceuticals Incorporated ("Vertex") securities during the Class Period, including providing testimony at deposition and trial, if necessary.

4.  During the Class Period, the Bristol Pension Fund purchased the Vertex securities that are the subject of the Complaint as set forth on the attached Schedule A.

5.  The Bristol Pension Fund did not engage in the foregoing transactions at the direction of counsel, or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6.  During the three-year period preceding the date of my signing this Certification, The Bristol Pension Fund has served or sought to serve as a representative party or lead plaintiff on behalf of a class in a private action arising under the Securities Act or the Exchange Act in the following cases:

> *City of Roseville Employees' Retirement System v. Nokia Corporation, et al.*, 1:10-cv-00967-GBD (S.D.N.Y.) (moved to be appointed as lead plaintiff but was not appointed.)

> *City of Royal Oak Retirement System v. Juniper Networks, Inc., et al.* 5:11-cv-04003-LHK (N.D. Cal.) (moved to be appointed as lead plaintiff and was appointed.)

> *Smilovits v. First Solar Incorporated, et al.* 2:12-cv-00555-DGC (D. Ariz.) (moved to be appointed as lead plaintiff but was not appointed.)

7.  The Bristol Pension Fund will not accept any payment for serving as a representative party on behalf of the class beyond its *pro rata* share of any recovery, except for such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed at _____
_____.  (city, state)

THE CITY OF BRISTOL PENSION FUND

9/5/12

Date

Glenn S. Klocko
Comptroller and Trustee

2

## <u>SCHEDULE A</u>

THE CITY OF BRISTOL PENSION FUND

Class Period Transactions in Vertex Pharmaceuticals Incorporated
(Class Period: 5/7/2012 through 6/27/2012)

| Trade Date | Action (Buy/Sell) | Quantity | Price Per Share |
|------------|-------------------|----------|-----------------|
| 5/30/2012  | Buy               | 30,000   | $60.16          |