# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **CITY OF BRISTOL PENSION FUND,** on behalf of itself and all others similarly situated, | ) ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Civil Action No.** **12-11654-FDS** |
| **VERTEX PHARMACEUTICALS INC., JOSHUA BOGER, Ph.D., JEFFREY LEIDEN, M.D., Ph.D., PETER MUELLER, Ph.D., PAUL SILVA, ELAINE ULLIAN, and NANCY J. WYSENSKI,** | ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |

## MEMORANDUM AND ORDER
## ON DEFENDANTS' MOTION TO DISMISS

**SAYLOR, J.**

This is a putative class action involving alleged violations of the Securities Exchange Act of 1934 and Rule 10b-5. The City of Bristol Pension Fund ("Bristol") has brought suit on behalf of a class of similarly situated persons against Vertex Pharmaceuticals, Inc., and various Vertex executives. Bristol, as lead plaintiff, alleges that it was harmed when it purchased Vertex's common stock at prices that were artificially inflated by the company's false and misleading statements about its products. It also alleges that a number of Vertex executives personally profited by selling millions of dollars of Vertex stock while its value was artificially inflated.

Defendants have filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on the ground that the complaint fails to state a claim under the heightened pleading requirements for actions alleging securities fraud. It is essentially undisputed that Vertex made a false statement

on May 7, 2012, when it released the interim results of a Phase II clinical study concerning a combination therapy for cystic fibrosis. The basic problem with the complaint, however, is that Vertex corrected that statement on May 29, and plaintiff did not purchase any shares until May 30. Plaintiff thus is without standing to assert claims arising out of the May 7 statement, and cannot establish that the misrepresentation caused it any loss. Plaintiff attempts to cobble together a claim based on the lingering effects of the May 7 statement and various other alleged misstatements and omissions, but those efforts fall short of the required showing to withstand a motion to dismiss. Accordingly, and for the reasons set forth below, defendants' motion will be granted.

## I. Background

Unless otherwise noted, all facts are stated as set forth in the complaint.[1]

### A. Factual Background

Vertex is a biotechnology company that researches, develops, and commercializes pharmaceuticals to treat a variety of illnesses. (Am. Compl. ¶¶ 13, 21). The company's products include treatments for hepatitis C, HIV, and cancer. (*Id*.). At the relevant time, Vertex was based in Cambridge, Massachusetts. (*Id*. ¶¶ 2, 13).

Joshua Boger, Ph.D., founded Vertex in 1989. He was formerly the Chief Executive Officer and Chairman of the Board; in 2012, he was serving as a Director. (*Id*. ¶ 14). Jeffrey Leiden, M.D., Ph.D., was the President and Chief Executive Officer of Vertex. (*Id*. ¶ 15). Peter

---

[1] While ordinarily "any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden . . . courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). *See Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 86 (1st Cir. 2008).

Mueller, Ph.D., was the Executive Vice President of Global Research & Development. (*Id.* ¶ 16). Elaine Ullian was the co-lead independent director. (*Id.* ¶ 18). From 2008 to April 2011, Paul Silva served as Vice President and Corporate Controller. (*Id.* ¶ 17). From December 2009 to June 2012, Nancy J. Wysenski was Chief Commercial Officer and Executive Vice President. (*Id.* ¶ 19).

One of Vertex's products is the drug Kalydeco, which was approved by the Food and Drug Administration for use in treating cystic fibrosis in early 2012. (*Id.* ¶¶ 4, 23).

Cystic fibrosis is a disease that causes the body to produce abnormal amounts of mucus in the lungs and the pancreas. It typically results in life-threatening lung infections and digestion problems. (*Id.* ¶ 24). Approximately 30,000 people in the United States have cystic fibrosis. (*Id.*). Currently, there is no cure for the disease. (*Id.*).

Cystic fibrosis is a genetic disease. (*Id.*). It is caused by mutations that affect a particular protein, so that, among other things, the protein does not properly regulate the movement of chloride in and out of the lungs. (*Id.* ¶ 25). The majority of cases involve the "F508del" mutation. (*Id.*). Approximately 4% of cases involve the "G551D" mutation. (*Id.* ¶ 23).

In January 2012, Vertex received FDA approval for use of Kalydeco with patients who had the G551D mutation. (*Id.* ¶ 23). In early 2012, Vertex also began exploring the combination of Kalydeco with another medication, VX-809. (*Id.*).

Vertex began its Phase II trial of VX-809 and Kalydeco in combination by enrolling 108 patients for the study. Patients were asked to cease their antibiotic treatments, as most cystic fibrosis patients cycle antibiotics and tend to deteriorate when off the antibiotics. (*Id.* ¶ 26). Varying dosages of VX-809 were given to patients for 28 days, followed by Kalydeco for 28

days.  The control group received placebo pills during the entire 56-day period.  (*Id.*)

On May 7, 2012, Vertex announced in a press release that it had achieved significant "interim results" in the Phase II clinical study that combined VX-809 and Kalydeco.  (*Id.* ¶ 29; Sylvia Aff., Ex. A).[2]  The press release stated that "approximately 46 percent (17/37) [of patients] experienced an *absolute* improvement from baseline to Day 56 in lung function of 5 percentage points or more," and that "approximately 30 percent (11/37) experienced an *absolute* improvement from baseline to Day 56 of 10 percentage points or more."  (Am. Compl. ¶ 29) (emphasis added).  The press release also noted that in comparison, none of the patients treated with placebo achieved an improvement of five percentage points or more.  (*Id.*).  The press release included information about sweat chloride levels and stated that the "reductions were not statistically significant."  (*Id.* ¶ 31; Sylvia Aff., Ex. A at 3).[3]

Vertex held a conference call with analysts on May 7.  During the call, Mueller, the Chief Scientific Officer, remarked that he "had never seen anything like this" and called the results "really fantastic."  (Am. Compl. ¶ 32).  Leiden, the Chief Executive Officer, remarked that Vertex's hepatitis C drug and Kalydeco had provided significant cash flows to the company and indicated that it would "accelerate" its investment into the next stage.  (*Id.* ¶ 33).  Wysenski, the

---

[2] "Before presentation of a new drug to the FDA, pharmaceutical companies are required to engage in three phases of clinical trials, with each phase growing in complexity and size, before ultimate presentation to the FDA. Phase 1 consists of a closely monitored, relatively small study (twenty to eighty volunteers) to determine the safety of the drug and, if possible, early evidence of effectiveness.  *See* 21 C.F.R. § 312.21(a).  Phase 2 involves further clinical research and study to determine the drug's efficacy and any 'common short-term side effects and risks associated with the drug.'  *Id.* § 312.21(b).  Finally, Phase 3 clinical trials 'are performed after preliminary evidence suggesting effectiveness of the drug has been obtained' and usually include 'several hundred to several thousand subjects.'  *Id.* § 312.21(c)."  *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 148 (2d Cir. 2013).

[3] According to the complaint, measurements of sweat chloride levels are the "gold standard" for research on cystic fibrosis.  (Am. Compl. ¶ 43).  The complaint alleges that Vertex focused in the statements at issue here on an alternative potential marker for effectiveness known as FEV1.  FEV1 assesses lung function by measuring a person's forced expired volume during one second of exhalation.

Chief Financial Officer, said that the potential market for the treatment was 70,000 patients, which would amount to billions of dollars of potential sales. (*Id.*).[4]

At the end of the day on May 7, Vertex's stock price, which had closed at $37.41 per share on May 4, closed at $58.12 per share. (*Id.* ¶ 36). Trading volume that day was 40 times the average. (*Id.*). In the subsequent weeks, the company's stock price climbed as high as $64.94. (*Id.* ¶ 38).

The complaint alleges that defendants knew, or were reckless in not knowing, that the released results were "too good to be true." (*Id.* ¶ 41). According to a confidential witness ("CW2") who was a Vertex senior director from 2004 to June 2012, the company had the results for two weeks prior to releasing them; the results "would have been sent" to defendant Wysenski and others, and a committee of executives "met to review the results to determine whether the information was material and warranted release." (*Id.* ¶ 42).[5] Another witness ("CW1"), who worked at Vertex prior to 2012, states that some employees were "highly skeptical" of the results because there was "a noted lack of sweat chloride improvement" and the "data announced on May 7, 2012 was just 'too beautiful'" and "needed to be checked." (*Id.* ¶ 43). Another witness ("CW3"), who was an analytical development employee from October 2011 to October 2012, asserts that people within Vertex knew that VX-809 made Kalydeco "work less well." (*Id.* ¶ 44).

---

[4] The following day, Chief Financial Officer Ian Smith reiterated that the company was planning to accelerate the development of the combination treatment and was in discussions with the U.S. Food and Drug Administration and European authorities. (Am. Compl. ¶ 35).

[5] Under the PSLRA, a plaintiff may rely on a confidential witness and need not provide his or her name as long as the witness is "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 51 (1st Cir. 2008). Courts must evaluate such witnesses based on factors such as "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.*

CW3 also asserts that the positive results were driven by two outlier patients. (*Id.* ¶ 45). A fourth witness ("CW4"), who was the Vice President of Global Medical Affairs from 2007 through September 2012, attributes the reported decline in the lung function of the placebo group to an antibiotics cycle, not to the combination treatment. (*Id.* ¶ 59).

Between May 7 and May 23, 2012, Boger, Mueller, Silva, Ullian, and Wysenski collectively sold more than 539,000 shares of Vertex for $31.9 million. (*Id.* ¶¶ 38, 87; *see* Sylvia Aff., Exs. F, G, H).[6] Wysenski alone sold approximately 180,000 shares for more than $10 million on May 7 and 8 and 180,000 shares for more than $11.5 million on May 14. (*Id.* ¶ 87).[7]

On May 29, 2012, Vertex issued a statement correcting the May 7 press release. The new disclosure explained that the data concerning improvement in lung function for patients was "relative" rather than "absolute." (Am. Compl. ¶¶ 40, 47, 49; *see* Sylvia Aff., Ex. B). According to the company, the results were still statistically significant but less dramatic. (Sylvia Aff., Ex. B at 1). Vertex also reported additional positive data; half of the patients had experienced an 8.5% mean "absolute" improvement in FEV1 compared to patients in the placebo group, who experienced a 4.5% decline. (Am. Compl. ¶ 48). Leiden, speaking on a conference call with analysts that day, attributed the error to a "misinterpretation between Vertex and [an] outside statistical analysis vendor concerning the type of analysis performed." (Sylvia Aff., Ex. I at 3; *see* Am. Compl. ¶ 49).

According to two confidential witnesses, CW1 and CW2, a Vertex employee received the

---

[6] According to defendants, seven of the ten separate sales made by defendant insiders during that period were made automatically pursuant to approved Rule 10b5-1 plans. (Def. Mem. at 5).

[7] According to defendants, Wysenski exercised options and sold stock because she was planning to (and did) retire in June 2012. (Def. Mem. at 16; *see* Sylvia Aff., Exs. H, K).

raw data and should have realized that the data was "suspect." Thus, according to the complaint, the error actually occurred within Vertex, not with the vendor. (Am. Compl. ¶ 51).[8]

On May 30, Leiden stated on a conference call with analysts that the data remained reliable, that the results were "consistent" and "highly statistically significant," and that the combination treatment "exceeded [Vertex's] expectations." (*Id*. ¶ 54). However, according to the complaint, those statements did not disclose the existence of inconsistent data, the alleged unreliability of the data, the lack of meaningful change in the important measure of sweat chloride amounts, the variability in the rate of improvement and impact of two outliers, and the impact of the medication cycles of patients. (*Id*. ¶¶ 57-58, 60).

At the time of the May 7 press release and conference call and the May 29 corrective disclosure, Bristol had not yet purchased Vertex stock. Bristol purchased 30,000 shares of Vertex common stock on May 30, 2012, the day after the corrective disclosure. (*Id*., Sched. A). It paid $60.16 per share. (*Id.*).

On June 28, 2012, Vertex announced the final results of the clinical study. Vertex did not present the results based on absolute improvement over a 56-day period; rather, it described the absolute improvement from day 28 to day 56. (*Id*. ¶ 62). News coverage of the results indicated that "investor skepticism" about the data "sparked a sharp selloff of company shares." (*Id*. ¶ 65). Vertex's stock price fell from a close of $61.11 on June 27, 2012, to a close of $51.18

---

[8] At oral argument, counsel for plaintiff stated that the confidential witnesses said that "there was no vendor," suggesting that Vertex's assignment of blame to a non-existent vendor was an additional misrepresentation. (Hrg. Tr. 9:7, Nov. 25, 2013). However, the complaint does not identify the statement as a misrepresentation as to the existence of a vendor and, in fact, alleges that there was a vendor. For example, "[a]ccording to CW2, the individual at Vertex tasked with receiving the raw data . . . should have known about the suspect nature of the data, regardless of how it was presented by *the vendor*." (Am. Compl. ¶ 50 (emphasis added)). *See* Am. Compl. ¶ 44 ("Defendants could easily have confirmed the percentage improvement calculations reported by *Vertex's vendor* . . . .") (emphasis added). What the complaint contends, in substance, is that any error in the results should be attributed to Vertex and not to the vendor. (*See* Am. Compl. ¶ 51).

on June 28.  (*Id*. ¶ 66).

According to defendants, the FDA has since granted the combination therapy a "Breakthrough Therapy Designation" based on the Phase II trial results, and Vertex has initiated Phase III trials.  (Def. Mem. at 2).

## B.  Procedural Background

On September 6, 2012, Bristol filed a complaint on behalf of all purchasers of Vertex common stock between May 7, 2012, and June 28, 2012.  It filed an amended complaint on September 5, 2012.  The amended complaint contends that Vertex and the individual defendants violated Section 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5; that the individual defendants violated Section 20(a) of the 1934 Act; and that defendants Boger, Mueller, Silva, Ullian, and Wysenski violated Section 20A of the 1934 Act.

Defendants have moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

## II.  Analysis

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).  Pursuant to that section, the SEC promulgated Rule 10b–5, which makes it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Section 10(b) requires proof of six elements:  "(1) a material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 649 F.3d 5, 20 (1st Cir. 2011) (*quoting City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 756 (1st Cir. 2011)).

On a Rule 12(b)(6) motion to dismiss a claim brought under Section 10(b), courts must, as with any such motion, accept plaintiff's allegations as true.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  However, Congress has raised the standard of pleading for Section 10(b) and Rule 10b-5 securities fraud claims.[9]  When a plaintiff in such a case alleges misrepresentation or omission of a material fact, the law requires that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  To plead scienter, the complaint must "with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  A strong inference is

---

[9] "In 1995, Congress enacted legislation attempting to wrest control over securities fraud class action lawsuits from the plaintiffs' bar devoted to such litigation and confer it upon counsel for larger institutional investors.  Such a measure, it was believed, would cut down on frivolous litigation as counsel for institutional investors were thought to take a more balanced cost-benefit view of such litigation.  While at it, Congress raised the hurdle a plaintiff would have to jump before being permitted to present her case to a jury."  *Lirette v. Shiva Corp.*, 27 F. Supp. 2d 268, 271 (D. Mass. 1998) (internal citations omitted).

"more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Courts should look at the complaint "as a whole" and weigh "competing inferences" in a "comparative evaluation" of plaintiff's allegations and alternative inferences from those allegations. *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008); *see also Tellabs*, 551 U.S. at 314. If "there are equally strong inferences for and against scienter," then the tie goes to the plaintiff. *New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 45 (1st Cir. 2008) (*quoting ACA Fin.*, 512 F.3d at 59).

### A. Standing

As in any class action, the named plaintiff must individually fulfill the standing requirement at the time of filing before being able to represent a class. *See, e.g.*, *Sosna v. Iowa*, 419 U.S. 393, 402 (1975); *In re New Motor Vehicles Canadian Export Antitrust Litigation*, 522 F.3d 6, 13-14 (1st Cir. 2008); *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 135 (3d Cir. 2000). The alleged class period here is from May 7 to June 28, 2012. Defendants contend that plaintiff lacks standing to assert claims based on the alleged May 7 misrepresentation because it purchased stock on May 30, after the May 29 press release stating that the May 7 press release was incorrect in that it reported data in absolute, rather than relative, terms.[10]

---

[10] Defendants asserted a similar argument in opposition to plaintiff's motion for appointment of lead plaintiff and lead counsel, but the Court did not definitively rule on the issue in its earlier memorandum and order concerning that appointment. Instead, the Court took "no position as to whether this argument, or any of defendants' other challenges to plaintiff's standing, may prove meritorious at a later stage in the suit," and merely found that plaintiff was "sufficiently typical to satisfy the standard for designation of the lead plaintiff." (Dkt. No. 27, Memo. & Order at 7, n.2 (Dec. 21, 2012)). Indeed, as other courts have recognized, the typicality inquiry for class certification and the standing inquiry are distinct. *See, e.g.*, *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 14 (D. Mass. 2004); *Abato v. Marcam Corp.*, 162 F.R.D. 8, 10-11 (D. Mass. 1995).

Generally, a plaintiff who did not reasonably rely on a misrepresentation or who suffered no loss because of a misrepresentation lacks standing to sue under the PSLRA. Thus, for example, a plaintiff who purchased stock prior to the alleged class period lacks standing. *See Gross v. Summa Four, Inc.*, 93 F.3d 987, 993 (1st Cir. 1996) ("[B]ecause [plaintiff] purchased his stock on May 27, 1994, well before [defendant] issued the June 29 letter, he has no standing to complain about the statements included in the letter."). And a plaintiff who purchased after a corrective disclosure was made would have no standing, because relying on the earlier misrepresentation would no longer be reasonable in light of the new information; furthermore, the market is assumed to have processed the correction, which would be reflected in the stock price. *See Basic Inc. v. Levinson*, 485 U.S. 224, 246-47 (1988). In cases of multiple allegedly misleading statements, a lead plaintiff need not have purchased stock after all statements were made, as long as those statements were part of a "common scheme to defraud." *Crowell*, 343 F. Supp. 2d at 13 (internal quotation omitted). *See In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 275 F.R.D. 382, 387 (D. Mass. 2011). *But see In re Bank of Boston Corp. Sec. Litig.*, 762 F. Supp. 1525, 1532 (D. Mass. 1991) (holding that a plaintiff only has standing to sue based on misrepresentations made prior to the date he purchased stock). *Cf. Abato v. Marcam Corp.*, 162 F.R.D. 8, 10-11 (D. Mass. 1995) (expressing doubt as to whether the "common course of conduct" test for class certification applies to standing).

Plaintiff contends that the May 29 press release was not a corrective disclosure, but instead included additional misstatements and "perpetuate[d] a known misleading presentation of the study's results." (Pl. Mem. at 11). As noted, the critical alleged misrepresentation of May 7 is that the data showed absolute improvement in patients. On May 29, defendants announced

that the improvement was relative, not absolute. Vertex stock dropped from $64.85 per share at closing on May 25 to $57.80 on May 29. (Sylvia Aff., Ex. C). The alleged misstatements of May 29 and May 30—attributing the error to the vendor; describing the corrected results as consistent and statistically significant; and reporting new positive data—are related to the May 7 misstatement insofar as they address the interim study results. Put another way, they cannot be understood in context without understanding what happened on May 7. But in light of the May 29 correction, they are not the same misrepresentation, or sufficiently similar, to constitute a single "common scheme" extending from May 7 through June 28.

Of course, the May 29 and 30 statements may themselves be misleading, and therefore grounds for suit. That question will be addressed below. But plaintiff lacks standing to contest that the statements defendants made on May 7, or otherwise prior to May 29, were misrepresentations under the PSLRA.

### B. Material Misrepresentation

Information is material "if a reasonable investor would have viewed it as 'having significantly altered the total mix of information made available.'" *Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 85 (1st Cir. 2008) (*quoting Basic*, 485 U.S. at 232). A statement that is merely false or incomplete, but not material, will not give rise to a securities violation. *Basic*, 485 U.S. at 238. A disclosure of certain facts may trigger a duty to disclose others where necessary to avoid making a misleading statement. *See* 17 C.F.R. § 240.10b–5 (requiring that, when a company speaks, it disclose facts that would be "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading"); *Gross*, 93 F.3d at 992 (holding that a duty to disclose may arise if a

company "previously made a statement of material fact that is either false, inaccurate, incomplete, or misleading in light of the undisclosed information").

The complaint alleges that defendants made multiple material misrepresentations on three separate dates:  May 7, May 29, and May 30.  The statements generally involve three topics:  (1) reporting of the study's design and its interim results; (2) Vertex's plans and predictions; and (3) the error in reporting the results.[11]

Again, plaintiff urges that the statements should be considered as a single, multi-stage violation, and that the total mix of information available to the market was persistently misleading.  While certainly the Court's inquiry should not have an unduly narrow focus, it is appropriate to address individually each statement and the period of time that it allegedly affected the market.  *See Urman v. Novelos Therapeutics, Inc.*, 796 F. Supp. 2d 277, 282 (D. Mass. 2011) ("Because the statements are closely related and may be grouped together for consideration without diminishing the individualized attention needed to be given to each, the Court considers each category of statements in turn.").

## 1.  Reporting of Study Design and Interim Results

The first set of alleged false and misleading statements concerns the reporting of the design of the study and the Phase II interim results.

The May 7 press release reported interim study results in terms of "absolute

---

[11] Multiple courts have dismissed claims of securities fraud arising out of the release of data from early-stage clinical trials of pharmaceuticals or other biotechnology products.  *See, e.g.*, *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 156 (2d Cir. 2013) (affirming dismissal of fraud claims based upon alleged omissions in disclosure of phase 2 trial results); *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 882, 885 (9th Cir. 2012) (affirming dismissal of fraud claims based upon phase 2 trial disclosure where plaintiff failed to show falsity or scienter); *Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1044 (N.D. Cal. 2012) (dismissing fraud claims based upon phase 2 trial results with prejudice where claims rested on "highly unreliable confidential witness statements"); *Sarafin v. BioMimetic Therapeutics, Inc.*, 2013 U.S. Dist. LEXIS 4909, at *26, 57-58 (M.D. Tenn. Jan. 10, 2013) (dismissing fraud claims based upon disclosure of clinical trial results).

improvement." Those reports were repeated the following day on the conference call. For example, Mueller remarked that "10% absolute improvement" is "fantastic" and "really, really fantastic." (Am. Compl. ¶ 32). Those statements clearly were incorrect in at least one respect; as Vertex acknowledged in the May 29 press release, the results were relative, not absolute.

In the May 29 press release, Vertex also announced additional data that half of the patients receiving the combination treatment experienced an 8.5% mean absolute improvement in FEV1 compared to the placebo group, which experienced a 4.5% decline.

Plaintiff contends that the May 29 statements are misleading because defendants described the results as showing "consistent trends." (Am. Compl. ¶ 57). In particular, plaintiff contends that defendants failed to disclose the effect of the antibiotic cycle, the sweat chloride results, and the small size of the study and the effect of two outlier patients on the results. Plaintiff also objects to the company's statements that the results were statistically significant.

First, plaintiff contends that defendants did not discuss the underlying effect of patients' antibiotic cycle, which it alleges caused the disparity. However, defendants did discuss during the May 29 conference call the fact that one potential cause of the 4.5% decline was the impact of the antibiotic cycle. (*See* Sylvia Aff., Ex. I at 8). Thus, the complete data made available by the company to the market—and notably to Bristol when it purchased shares on May 30—included information about the possible effect of the antibiotic cycle.

Second, the May 7 press release had reported that the data concerning patients' sweat chloride levels was "not statistically significant." (*See* Sylvia Aff. Ex. A at 3). The May 29 release did not mention sweat chloride levels at all. Plaintiff contends that those disclosures were misleading because defendants first downplayed the importance of that statistic, which was

14

a primary endpoint for the study, and then failed to mention the issue. Plaintiff is correct that Vertex did not highlight this factor. But it did disclose it in the May 7 press release (albeit on page two, not page one). Because the May 29 press release focused on amending the reported results to read as relative rather than absolute, and because no amendment concerning sweat chloride levels was necessary, the statements concerning sweat chloride levels are not false and misleading.

Third, plaintiff contends that defendants did not address the variability and unreliability resulting from the study's small size and the impact of two outlier patients who allegedly skewed the data. However, that argument, too, is unconvincing. Defendants disclosed the number of patients in the study; indeed, they did so in the May 7 press release. (*See* Sylvia Aff., Ex. A at 1). The small size of the study could obviously render the data unreliable. But investors were given that piece of information and were not misled to a different conclusion. In addition, defendants provided tiered data, reporting what number of patients achieved an improvement of five percent or more and of ten percent or more. (*Id.* at 2). In that format, the presence of outliers was made reasonably clear. The uncontestedly accurate data in this form would not be misleading to the average investor.

Finally, on the May 30 conference call, defendant Leiden said that the data about the combination treatment showed a positive "consistent trend" that was "highly statistically significant, with a p of 0.002." (Am. Compl. ¶ 54). Plaintiff alleges that the statement is misleading because it misled the market about the stability, strength, and reliability of the results, when in fact the results were "at best, marginal and ambiguous." (Pl. Mem. at 13). Importantly, plaintiff does not allege that defendants presented factually incorrect information about the p

value or whether the interim results showed consistent trends. *See S.E.C. v. Selden*, 632 F. Supp. 2d 91, 94 (D. Mass. 2009) ("A p value of 0.05 or less (indicating a 95% level of certainty that the observed effect was not randomly induced) is generally accepted as showing a statistically-significant effect."). What plaintiff seems to take issue with is the general "rosy" picture that defendants attempted to paint about the results. (*See* Pl. Mem. at 13). But it is not illegal for a company to paint a positive or optimistic picture when disclosing information to investors. The problem arises when a company crosses the line from optimistic to misleading. Based on the totality of the circumstances, that did not occur here. In the context of the other information available about the study and the factually true results that Leiden was discussing, the statement about the p value and consistent trends was not materially misleading.

### 2. <u>Plans and Predictions</u>

The second category of allegedly false and misleading statements concerns the impact of the interim results on Vertex's business.

On multiple occasions, defendants indicated that Vertex would increase investment in the combination treatment because of the positive interim results. On the May 8 conference call, defendant Leiden stated that Vertex was "accelerating the development of [its] CF combination regimen." (Am. Compl. ¶ 33). CFO Smith remarked the following day that the company was holding "discussions with the FDA, discussions with the European authorities" and that the project was a "high priority." (Am. Compl. ¶ 35). Even after Vertex corrected the public results from absolute to relative, defendants maintained that they would accelerate development and the project was a priority. (*See* Sylvia Aff., Ex. I). The complaint alleges that these statements were misleading. There is, however, a distinct lack of information as to *how* they were misleading.

16

Because nothing in the amended complaint demonstrates those remarks would be misleading to the average investor, they are not actionable.

On the May 8 conference call, defendant Wysenski stated that the market for the combination treatment, if approved, could total more than 70,000 patients and billions of dollars of sales.  (Am. Compl. ¶ 33).  As before, there is no indication that this statement is false, and plaintiff does not detail how this argument is misleading beyond giving a highly optimistic view of the possible consequences of the results.  But a reasonable investor would also know the challenges of obtaining FDA approval.  *Biogen IDEC Inc.*, 537 F.3d at 48 ("[T]he investing public is well aware that drug trials are exactly that:  trials to determine the safety and efficacy of experimental drugs. And so trading in the shares of companies whose financial fortunes may turn on the outcome of such experimental drug trials inherently carries more risk than some other investments.").  No reasonable investor would interpret the interim results of a Phase II study for a pharmaceutical as a guarantee, or even a meaningful prediction, that those 70,000 patients and billions of dollars of sales will be realized.  Accordingly, defendant Wysenski's statement was not false or misleading under the circumstances.

### 3.     Error in Reporting Results

The final category of allegedly false and misleading statements stem from defendants' purported correction of the May 7 and 8 statements.

During the May 29 conference call, defendants Leiden and Mueller attributed the false report of data as absolute rather than relative to a "misinterpretation" between Vertex and a third-party vendor.  Relying on a confidential witness, CW2, plaintiff contends that the error occurred inside Vertex, not with the third-party vendor.  According to CW2, the employee who

received the data was a pulmonologist, who "should have known about the suspect nature of the data, regardless of how it was presented by the vendor." (Am. Compl. ¶ 50). It is unclear on what basis CW2—who, plaintiff contends, is the person tasked with overseeing the regulatory approval process—holds that opinion. In any event, plaintiff contends that, in fact, there was a "breakdown in internal controls" and "lack of scientific rigor" within Vertex that defendants hid from investors by blaming a third party. (Pl. Mem. at 2, 8).

For present purposes, the Court will assume that the error was internal, and thus the statement was false. It will also assume that the statement is misleading and material, albeit marginally so.[12]

In short, the only alleged material misrepresentation that had not been corrected by the time of plaintiff's stock purchase, and that is arguably actionable, is the May 29 attribution of fault to a third-party vendor. The remaining statements are not material and misleading and/or plaintiff lacks standing to challenge them.

## B. Scienter

After determining that the complaint alleges that a statement was materially false or misleading, the second step is to determine whether it properly alleges that defendants made the statement with scienter. The requisite state of mind under securities laws is either conscious intent to defraud or a high degree of recklessness. *ACA Fin.*, 512 F.3d at 58; *see also Boston Scientific Corp.*, 649 F.3d at 20 ("Scienter is an intention to deceive, manipulate, or defraud."

---

[12] Plaintiff further contends that defendants misled investors about the adequacy of Vertex's internal controls by stating that "Vertex is a company that prides itself on our scientific rigor and our scientific integrity." (Am. Compl. ¶ 49). That statement, made by Leiden on May 29, does not guarantee scientific rigor and integrity, and certainly does not promise a specific level of internal controls. Leiden was making a vague and positive assertion about company values in the context of the correction of a mistake. That would not be misleading to a reasonable investor, and therefore, it is not actionable under the securities laws.

(internal quotation omitted)). There must be a "strong inference" that the defendant had actual knowledge that the representation or omission was misleading. 15 U.S.C. §§ 78u-4(b)(2)(A), (f)(10)(A). "It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind." *Tellabs, Inc.*, 551 U.S. at 314. Instead, the court must "engage in a comparative evaluation" and weigh "competing inferences" to determine whether the inference of scienter is "cogent and compelling." *Id.* at 314, 324.

Compelling evidence of scienter most often includes "clear allegations of admissions, internal records or witnessed discussions" that suggest that defendants were "aware that they were withholding vital information or at least were warned by others that this was so" when they made the misleading statements. *In re Boston Scientific Corp. Sec. Litig.*, 686 F.3d 21, 31 (1st Cir. 2012). Contemporaneous insider trading may provide additional support for a finding that a defendant acted with scienter. *Biogen IDEC Inc.*, 537 F.3d at 55.

Plaintiff offers few concrete allegations in support of its contention that defendants knowingly or recklessly attributed the error to a third-party vendor. The complaint does not, for example, allege that the error was entirely internal and that the vendor presented clear data that a Vertex employee then manipulated. Instead, it simply alleges that the employee who received the data should have known how to interpret it, regardless of how the vendor reported it. There are no specific allegations (whether from a confidential witness, a document, or otherwise) that any defendant actually knew that the statements were false. Plaintiff thus has not offered a plausible basis, whether from a confidential source or otherwise, that any of defendants actually knew that the error occurred internally.

Lacking evidence of actual knowledge, a plaintiff may seek to prove scienter by proving

recklessness. But it "still must allege, with sufficient particularity, that defendants had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors." *In re PLC Sys., Inc. Sec. Litig.*, 41 F. Supp. 2d 106, 114 (D. Mass. 1999) (*citing Maldonado v. Dominguez*, 137 F.3d 1, 9 n.4 (1st Cir. 1998)). That, too, is absent here.

Plaintiff offers information about defendants' trading activities during the class period to further support its allegations of scienter. To determine whether defendants' sales were unusual or suspicious, and thus probative of scienter, plaintiffs typically compare the trading activities of insiders during the class period to the their trading histories during an earlier, similar time period. However, plaintiff here "fails to set forth the amount of trading [defendants] conducted before or after the class period . . . that might support a finding of unusualness." *Lirette*, 27 F. Supp. 2d at 283. *See Waters Corp.*, 632 F.3d at 761. No such comparisons have been made here, even though the information concerning those sales is public knowledge.[13] According to defendants, Boger sold less than 2% of his holdings, which is not enough to raise an inference of scienter. *See id.* at 761 (holding that insider's sale of 4.82% of shares did not raise a strong inference of scienter).

The substantial trades made by defendant Wynsenski are unusual on their face, without regard to her retirement or her prior trading history. However, this Court must "consider plausible nonculpable explanations" for such trades. *Tellabs*, 551 U.S. at 324. As noted, Wysenski retired from Vertex in June 2012 and sold her shares in connection with that departure. "It is not unusual for individuals leaving a company, like [defendant], to sell shares. Indeed, they often have a limited period of time to exercise their company stock options." *Greebel*, 194

---

[13] As noted, according to plaintiffs, the majority of the insider sales were prescheduled.

F.3d at 206. If any inference of scienter can be drawn from Wysenski's stock sales, it is

certainly far from strong. *Lenartz*, 879 F. Supp. 2d at 186-87 (retirement of individual defendant

provides context for large sum of sales that tends to negate inference of scienter); *Isham v. Perini

Corp.*, 665 F. Supp. 2d 28, 38 (D. Mass. 2009) (even if allegation that insider sold all of his

shares during class period supports an inference of scienter, "with respect to a motion to dismiss,

'even unusual sales by one insider do not give rise to a strong inference of scienter.'" (*quoting

Biogen IDEC Inc.*, 537 F.3d at 56)).

Because plaintiff has failed to show that the statements at issue were materially

misleading or made with scienter, this Court need not inquire into whether plaintiff has

adequately pleaded the other requirements of Section 10(b) and Rule 10b-5. Accordingly,

defendants' motion to dismiss the action as to the remaining statements will be granted.

### C. Sections 20(a) and 20A

Section 20(a) of the Exchange Act imposes joint and several liability on persons in

control of entities that violate securities laws. 15 U.S.C. § 78t. Section 20A of the Exchange

Act provides that an insider who trades stock "while in possession of material, nonpublic

information" is liable to any person who traded contemporaneously with the insider. 15 U.S.C. §

78t–1(a). However, violations of Section 20(a) and 20A each depend on an underlying violation

of the Exchange Act. 15 U.S.C. § 78t–1(a); *Waters*, 632 F.3d at 762 ("Because the plaintiff's

Section 20(a) claim was derivative of the Rule 10b–5 claim, it was properly dismissed as well.");

*ACA Fin. Guar. Corp.*, 512 F.3d at 67-68; *Carney v. Cambridge Tech. Partners, Inc.*, 135 F.

Supp. 2d 235, 257 (D. Mass. 2001) ("To state a claim for insider trading, the plaintiffs must have

adequately alleged a violation of the Exchange Act."). Because no underlying securities

violation exists here, the second and third counts of the amended complaint will be dismissed.

**III.**     **Conclusion**

For the foregoing reasons, defendants' motion to dismiss is GRANTED.

**So Ordered.**


                                              /s/ F. Dennis Saylor
                                              F. Dennis Saylor IV
Dated: March 31, 2014                         United States District Judge